### MARY F. KIMBALL

*v.*

### JAMES CUDDY *et al.*

*Filed at Ottawa May 15, 1886.*

1. MENTAL CAPACITY—*undue influence*—*in respect to the making of a deed or will.* To set aside a deed on the ground of mental weakness of the grantor, it is necessary to show such a degree of mental weakness as to render him incapable of understanding and protecting his own interests. The mere fact that his mental powers have been somewhat impaired by age or disease, is not sufficient, if the maker of the deed still retains a full comprehension of the meaning, design and effect of his acts, unless by reason of undue influence of the grantee he is unable to exercise his will in that respect.

2. The fact that a party is physically unable to look after his property, or his mind is enfeebled by age or disease, if not to the point of lunacy or abso-

lute imbecility, does not take from him the power to dispose of his property by deed or will, as he pleases.

3. Weakness of mind from age and sickness, short of absolute incapacity, may be considered, in connection with undue influence, as making the grantor an easier victim to such influence; but weakness and opportunity for undue influence do not prove that undue influence has been exercised.

4. The undue influence which will avoid a deed must be such as to destroy the freedom of the maker's will. Mere advice or argument or persuasion will not vitiate it, if made freely and from conviction, though it may appear that the instrument would not have been made but for such advice or persuasion.

5. Neither a deed nor a will can be impeached merely because of the injustice or impropriety of the provisions thereby made. If the maker is sane, he may, from caprice, causeless malice or foolish prejudice, cut off his children, and give his property to strangers. The moral injustice or caprice may be considered only as a circumstance on the question of insanity, but it is not a controlling one; and if, from other evidence, it be clear the party was sane, it is of no moment whatever.

APPEAL from the Circuit Court of Will county; the Hon. CHARLES BLANCHARD, Judge, presiding.

Mr. P. C. HALEY, for the appellant:

The burden of proof is upon the complainants. *English* v. *Porter*, 109 Ill. 285; *Roe* v. *Taylor*, 45 id. 485; *Dickie* v. *Carter*, 42 id. 376.

The bill alleges that the deed was procured by the use of intoxicants. To sustain this charge it must be clearly shown the deed was made during a time when reason was dethroned from this cause. The *onus* was upon appellees to show such was the case. 1 Jarman on Wills, 98, 99.

An influence, even if used, must be a present coercive power operating at the time of the execution of the deed. *Broomfield* v. *Broomfield*, 43 Ill. 155; *Moore* v. *Barclay*, 17 Ohio St. 302.

A draft of a previous will, though never executed, may throw considerable light upon a testator's intention. *Thornton* v. *Thornton*, 39 Vt. 122.

A man's memory may be impaired; his brain may have lost its normal vigor; he may have been paralyzed; he may be over eighty years of age; he may be an inmate of a luna-

tic asylum; still, if he has capacity to understand the nature and effect of his act, it is valid. *Fish* v. *Newell*, 62 Ill. 195; *Rutherford* v. *Morris*, 77 id. 397; *Willemin* v. *Dunn*, 93 id. 511; *Brown* v. *Riggin*, 94 id. 560; *English* v. *Porter*, 109 id. 285.

In *Lowe* v. *Williamson*, 1 Gr. Ch. (N. J.) 82, it is said, though the influence acquired by kind offices be exercised over a testator above eighty years of age, whose bodily faculties are impaired, and who, with good reason, entertains feelings of hostility toward his family, the will can not on that account be invalidated.

Even where a man lives with a woman to whom he is not married, and leaves her his estate, the law will not presume undue influence. *Main* v. *Ryder*, 84 Pa. St. 217; *Farr* v. *Thompson*, Cheves, 37; *Roe* v. *Taylor*, 45 Ill. 485; *English* v. *Porter*, 109 id. 285.

Influence will never be presumed from mere opportunity. *Boyse* v. *Rossborough*, 6 H. L. C. 2; *Cudney* v. *Cudney*, 60 N. Y. 62.

Where a man in an enfeebled condition was so dependent upon his wife that she must naturally possess great influence over him, made a will making an unequal disposition of his property, it was held to create no presumption of improper influence. *Meeker* v. *Meeker*, 75 Ill. 260. See, also, *Brown* v. *Riggin*, 94 Ill. 560; *Carpenter* v. *Calvert*, 83 id. 62.

Mr. C. W. BROWN, for the appellees:

The acts and contracts of persons of weak understanding, who are thereby liable to imposition, will be held void in courts of equity, if the nature of the act or contract justify the conclusion that the party has not exercised a deliberate judgment, but that he has been imposed upon, circumvented or overcome by cunning, artifice or undue influence. 1 Story's Eq. Jur. sec. 238; 1 Ohio St. 58.

It is immaterial from what cause the weakness arises. 1 Story's Eq. Jur. sec. 234.

For cases where gifts of feeble old men set aside for undue influence, see *Todd* v. *Grove,* 33 Md. 188; *Dean* v. *Phillips,* 5 W. Va. 188.

When parents are aged and infirm, courts of equity will regard with suspicion their contracts with their children, unless plainly for the advantage of the parent.    57 Barb. 453.

If a person is of feeble understanding, and the bargain is unconscionable, what better proof can one wish of its being obtained by fraud or imposition, or undue influence, or by the power of the strong over the weak?   1 Story's Eq. Jur. sec. 236; 2 Johns. Ch. 238; *Oard* v. *Oard,* 59 Ill. 46; *Frazier* v. *Miller,* 16 id. 49.

In *Huegenin* v. *Basely,* 14 Ves. Jr. 273, and *Purcell* v. *McNamard,* 16 id. 118, deeds were cancelled upon the ground of ignorance and undue influence.   See, also, *Van Horn* v. *Keenan,* 28 Ill. 445; 1 Story's Eq. sec. 309 b.

In all cases of alleged undue influence, the mental strength and capacity of the testator are directly in issue.   *Waterman* v. *Whitney,* 11 N. Y. 137.

When a will is written or procured to be written by a person benefited by it, these are circumstances to excite stricter scrutiny, and require stricter proof of volition and capacity. *Duffield* v. *Robeson,* 3 Harr. 384; *Tompkins* v. *Tompkins,* 1 Bailey, 92.

In this case the testator substantially ignored his children, and who can say it was a free and deliberate act of a poised and clearly disposing mind?   The attesting witnesses could not swear to the antecedent agencies by which that will and codicil were procured.   That evidence is wanting in this case, and the will should be set aside.   *Harrell* v. *Harrell,* 1 Duv. 203; *Cramer* v. *Krambaugh,* 3 Md. 431.

It is not to be supposed that fraud and undue influence are ordinarily susceptible of direct proof.   In some cases the courts have held that fraud and undue influence will be in-

ferred from the nature of the transaction, alone. *Tyler* v. *Gardner*, 35 N. Y. 595; 2 Sheld. 272.

The inquiry whether undue influence was exerted over the mind of the testator should not be confined to the execution of a will. It should be whether any undue influence operated on him in the disposition of his property. *White* v. *Bailey*, 10 Mich. 155; *Beaubien* v. *Cicatle*, 12 id. 436; *Willetts* v. *Porter*, 42 Ind. 250.

The feebler the mind the less evidence will be required to invalidate the will of such a person on the ground of undue influence. *Reynolds* v. *Allen*, 90 Ill. 149.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

Hugh Kennedy died intestate, in Will county, on the 10th day of August, A. D. 1880, leaving surviving him his daughters, Ann Cuddy, Eliza Cunningham, Kate Kerwin and Mary F. Kimball, his only children and heirs at law. Before his death, on the 27th day of April, A. D. 1880, he conveyed all his real estate,—an eighty-acre tract of farm land in that county,—and gave all his personal property, to his daughter Mary F., taking back from her an obligation to support, maintain and nurse him during his life, and to pay all his debts, and his funeral expenses, etc., after his death. This bill is filed by Ann Cuddy, Eliza Cunningham and Kate Kerwin, (their husbands joining them,) against Mary F., to set aside the deed, on the ground that Kennedy was imbecile, and mentally incapable of making a deed at the time this deed was executed, and that it was caused to be executed by the undue influence of Mary F. She answered, denying the material allegations of the bill. On final hearing, the court decreed in conformity with the prayer of the bill, and the case comes here by the appeal of the defendant.

We have given the evidence, as it is presented in the printed abstract before us, careful consideration, and we are of opinion that it does not sustain the decree.

It must be kept in mind that the burden is upon complainants to prove the allegations of their bill; that they must show such a degree of mental weakness as renders the maker of the deed incapable of understanding and protecting his own interests; that the mere circumstance that the mental powers have been somewhat impaired by age or disease is not sufficient, if the maker of the deed still retains a full comprehension of the meaning, design and effect of his acts, unless, by reason of the undue influence of the grantee, he was unable to exercise his will in that respect. (*Willemin* v. *Dunn et al.* 93 Ill. 511, and cases there cited.) Moreover, the undue influence which will avoid an instrument of this character, must be such as to destroy the freedom of the maker's will. Mere advice or argument or persuasion would not vitiate it, if made freely and from conviction, though it might appear that the instrument would not have been made but for such advice or persuasion. *Roe et al.* v. *Taylor,* 45 Ill. 485; *Carmichael* v. *Reed,* id. 108.

The general condition physically, and, to some extent, mentally, of Kennedy, is presented by the testimony of Dr. George H. Hosmer, his attending physician throughout his illness, embracing the time when the deed was made. He was called and examined on behalf of the complainants, and evidently testifies without feeling or bias. He testified: "I attended Hugh Kennedy in his last illness; called about last of January until June; case of senile bronchitis with asthma. First, I treated him to relieve immediate suffering; that treatment extended through February. Then I became convinced that illness would be his last sickness. After that I called and prescribed for him with no hope of cure, but to relieve present suffering. In February found him up and sitting around; after that in bed. Did not know if invariably confined to bed, but think he was after February. Judge his age over seventy. In March, April and May found him in bed; generally more or less difficulty in conversation. At times he didn't appear

to be very stupid, at times he did. Had most of conversation with Mary, as it seemed to hurt him to talk. At first he could talk sensibly about himself, but gradually became weaker, bodily and mentally, until the end.' Can't state whether after February and March his mind was in condition to transact important business. I didn't have that in mind, and made no test. There may have been times that it was; probably not always. At times I visited him in February and March, he may have been of capacity to execute a deed. If I had that in view could tell, but made no test. There were times when he was not of sufficient understanding. I recollect, too, when he was in a stupor; it must have been last of May or first of June. After February he seemed to comprehend my coming, all but those two times. Could not say whether at that time I deemed him a man in full possession of his faculties. Think at times his faculties were impaired. He told me it hurt him to talk, and I mostly talked with his daughter. Would press on some part and ask him if it hurt him, and he would nod. I advised cough mixtures; opiates to relieve diarrhea; stimulants to relieve pustiation, and suitable nourishment. I advised brandy and whisky, suitable quantity, and left it to herself. I always found her a good nurse. Six or eight ounces a day would be reasonable for a man in his condition. A quart would intoxicate and prostrate."

*Cross-examined*—"First visit found him sitting by stove, suffering from senile bronchitis. Mental condition sound for man of his age; answered all questions directly and intelligently. First month he was in chair; after that in bed, and may have been in chair at times. Prescribed opiates in May for painful diarrhea; set in about May 1, continued to death; resulted in involuntary discharges, due to general debility. Want of control of bowels may exist where patient has not lost mental faculties. Resumed visits in six weeks after March 1; found him in bed, weakened down; after that saw him four or five times. During visit saw James P. Murphy,

J. P., in house where Mr. Kennedy was, some time in month
of February. On that occasion Mr. Kennedy was sitting in
chair by the fire in sitting room. Before illness he had been
in habit of using whisky. It was understood to give him
whisky when he was weak and sinking, and leave it a good
deal to himself when he wanted it. She told me she had
bought wine for his use, and I told her wine would gripe him,
and to get whisky or brandy. I recollect that very distinctly.
Persons in his condition, dying of general debility, are apt to
be stupid and weak at times, and at other times revived, and
more clear and active, mentally. In May and April he had
difficulty in bronchial region that made conversation painful,
and for a person not a physician to judge of his mental
condition, it would be necessary to observe him constantly
or frequently when not under the influence of stimulants,
and after periods of rest and before, to form correct opinion
of his mental condition. It was more difficult to judge of his
mental condition than of a person dying of general debility
whose vocal organs were all right. Nothing in his case more
likely to affect mental faculties than any man sinking under
asthma and bronchial affection. He exhibited no signs of
mental disorder existing prior to his illness, except such as
naturally produced by his bodily ailments. Nothing in his
case likely to produce mental disease more than other ail-
ments producing similar bodily and nervous prostration."

At such times as he was revived and mentally more active,
no reason is given in this evidence, though the doctor shows
that he made no examination of Kennedy's mind with refer-
ence to an opinion upon that subject, why Kennedy could not
make a deed. He thinks after February and March there
may have been times when his mind was competent to make
a deed—probably it was not at all times.

Now, Murphy, the justice of the peace, an apparently intel-
ligent and disinterested witness, visited him for the purpose
of transacting business, in February, and he also took the

acknowledgment of the deed. This is what he says: "Knew Hugh Kennedy over ten years. In 1880 saw him in Joliet. Saw him in Joliet on Jefferson streeet, and shook hands with him. I wrote out his will and testament at Mrs. Kimball's house. He was sick. He got out of bed and sat in a chair. He signed the will. It was witnessed by William Killeen and James Woods. Nobody present when the will was drawn, but Mr. Kennedy and myself. He gave me such directions as were necessary to the draft of the will. Nobody else gave me any directions. Once or twice his daughter came in and asked if he wanted anything, but the old man did not say anything, nor I didn't say anything, nor either of us do anything, until she went out. Two witnesses signed the will, and he gave it to me. He understood what he was doing. He was weak and sick, and as rational as anybody I could talk to. I think he was as sensible as anybody. Had possession of his senses then, in my opinion, as perfectly as when I had known him in good health. Saw him again in same house. That will was changed a little. I drew what is called a codicil. Can't tell how long I talked with him then. When I was drafting the codicil nobody present but Mr. Kennedy and I. He was in the same room, sitting in the same chair as before. He signed the codicil, and the two persons that witnessed the will witnessed it. His mind was as clear then as when I drew the will. Saw him again in the same house. Can't tell how long after. Went there with J. L. O'Donnell, near evening. I think O'Donnell requested me to go to acknowledge a deed. Mr. Kennedy was sitting up in bed. I got the deed and went into his room—next room to sitting room. I asked the old man if that was his signature, and if he understood the contents of the deed, and he said 'Yes.' Think O'Donnell drafted the body of the deed. Mr. Kennedy was sane and in his right mind then, but a little weaker than when I saw him previously. He and I talked about how comfortable he was, how well he was taken care of, and that it would probably be the last time I

would see him, as the man expected to die in a short time. He told me to destroy the will and codicil, after the deed was made. When he told me that, I think he was as sane and as reasonable as at any time I ever conversed with him. Near as I recollect I stood close by his bed while there. Mary Kimball was grantee in that deed. I destroyed the will and codicil in obedience to his directions. There was land given to Mrs. Kimball in the will. He told me it was the same land mentioned in the deed. That for fear there would be trouble about the will, and to put an end to that, he thought he would make it into a deed. The real estate mentioned in the will was given by the will to Mary Kimball. There were notes, a watch, a hat, and other things I can't remember, in the will. The notes were given to his brother, the other little articles to his daughters and daughters' children. The codicil made ·some change, but I am positive it was not the real estate. I think he was at all times determined that Mary Kimball should have the land. Think codicil was that his funeral expenses be paid, and what was left of the notes be divided amongst his daughters. The will and codicil were in my writing, and after they were executed no person ever saw them but me. I destroyed them the same evening I drew the deed. When I drew the will I learned his feelings were friendly towards Mary Kimball, and he was very grateful to her. I learned from him that Cuddy didn't treat him very well, and he wasn't very well pleased with Kerwin either. Don't recollect he said anything about Kavanaugh. My impression is it was from Cuddy he feared trouble."

Mr. O'Donnell, an attorney at law, testified that he went to see Kennedy on request communicated to him by the husband of the defendant, as having been made by Kennedy; that Kennedy talked intelligently of some general matters, and then told witness that he had made a will, and that he was afraid his son-in-law, Cuddy, would make Mary trouble when he died; that he wanted to make it safe; that Mary had been

very kind to him; that Kennedy then inquired if he could make a deed of the property to her, and upon being informed that he could, but that she would have to pay all his debts, Kennedy said, "Well, she can pay the debts; I want to make a deed to her." The witness then detailed some further conversation showing an intelligent understanding of his property, after which the witness left, promising to return on a future day. This conversation all, the witness says, occurred in the absence of the defendant. Some days afterwards, the defendant called upon the witness, saying that her father desired to see him. The witness then went again to Kennedy, taking Murphy, the justice of the peace who had drawn the will, with him. He testified that Kennedy then inquired why the witness had not come sooner, and he details conversations showing that Kennedy had an intelligent appreciation of his condition, and of the business in hand. The deed was then drawn, read over to Kennedy twice, and he signed it. He inquired what he owed the attorney, took out his pocket book, which was within reaching distance, and paid $5, promising to pay the residue when informed of the amount. The witness then proceeds thus: "Before the 'squire came in he said he wanted his daughter to pay his debts, give money to the priest for prayers, and build a monument, and wanted her bound in life to do that. I could get no paper but narrow note paper the child had. I said I would come again, and 'Squire Murphy said, 'Yes, Mr. O'Donnell can come up here any time.' Then the 'squire and he commenced talking Irish, and I went out and left them talking Irish in the room. The 'squire came out. I went back and asked what to do with the deed. He said give it to Mary, and let her do what she likes with it." On a subsequent day the witness drew the obligation binding the defendant to perform her part of the contract, and after the witness read it over to Kennedy, the defendant signed it. The witness afterwards adds: "I haven't any doubt Mr. Kennedy understood what he was doing, or I wouldn't

have drawn the deed. I am one of the attorneys in this case. At time I drew the deed I was not the attorney of Mrs. Kimball. I was paid by Mr. Kennedy. Once when I was there he said he trusted me to see that this thing was all right; said, 'I will trust you to see that my wishes are carried out as I want it,—that my property goes to Mrs. Kimball, and that she is not disturbed.'" On cross-examination, the witness further testified: "He (*i. e.*, Kennedy,) asked me if he could give a deed; I never saw his will; told him will was as good as deed; he said they were lawing about wills all the time; he never told me about his personal property except what I have said; don't recollect he ever told me what the will contained; he said he might linger a long time; he was a great burden to Mrs. Kimball, and she was very kind to him; he said Mr. Cuddy was very fond of lawing, and would make her trouble."

E. F. Dunham, a witness called for the complainants, testified that he served a summons on Kennedy on the 4th of May, A. D. 1880, and that Kennedy said he was as helpless as an infant, and had to be lifted out and in every day; that the defendant then told the witness that she thought Kennedy was not getting any better; that he talked better than common that day; that there were days that he lay stupid, and did not say anything. The witness added that Kennedy seemed confused, and did not know what to do. This, however, it will be recollected, was some eight days after the deed was executed, and Kennedy was, therefore, necessarily weakened and impaired each day, gradually,—slightly, though it may be,—by the constant acceleration of the disease which was wearing his life away. Still, in what this witness shows that Kennedy then said, there is no evidence of imbecility or serious mental impairment. The witness said: "He was in bed. I read summons, and he did not know what he could do; asked my advice. I told him it was note of hand. He asked what he had better do. I told him it would not make any difference whether he was there or not." On cross-ex-

amination the witness further said: "Voice low and feeble; asked my advice; he said he was too feeble and sick to attend to it; told him he was sued with McPartland, and it would make no difference whether he was there or not, they would get judgment anyway, and he said if that was so he would let it go." It is clear that he knew what the summons meant, and on being informed on what account the suit was brought, he seems to have as perfectly comprehended the situation as any one could. He talked as rationally as any one ordinarily would, lying physically helpless, in regard to a suit on a surety debt to which there was no legal defence.

Hugh McLaren testified, that he saw Hugh Kennedy at several different times after he went to the house of the defendant, which other evidence shows was the 20th of December, A. D. 1879. First time, he was sitting up. Talked with him. Next time, he was in bed. Kennedy then talked with witness. His mind was all right.

Peter Downey testified: "Visited Kennedy in spring and in July, A. D. 1880. Had conversations with him." And he says: "He recognized me, and conversed the same as during the last seventeen years. No difference, only I could see he was weaker. He was as rational talking and sensible as when I saw him in 1863."

Catherine Downey testified, she saw Hugh Kennedy; saw him frequently before and after he was taken sick, and conversed with him. She saw and conversed with him in May; he was then sitting up, but very weak. She also saw him in June and July. She says: "All that time I seen him he was capable of transacting any business, up to the 20th of July, by giving him a little time to talk.ℱ

Eliza Foley testified: "His mind was clear and bright in April. He understood what he was saying. Very weak, but his mind clear. So far as I could understand, he was able to sign a deed of land intelligently."

15—117 ILL.

C. J. Kimball: "Saw Kennedy almost every week during spring and summer of 1880. Saw him short time before he died." And he says: "During all that time I know he was in his right mind."

John H. Foley says: "Saw Hugh Kennedy at Kimball's very often. Saw him sick in bed, and talked with him up to a week before he died. * * * During that time he was in possession of his senses sufficiently to understand an ordinary business transaction."

William Stapleton testified, that he saw Hugh Kennedy in February, A. D. 1880, and again ten or twelve days before his death. In February he was perfectly sane.

Mary A. Wood testified, that after the middle of February, A. D. 1880, and until Hugh Kennedy died, she saw him sometimes every day, and sometimes two or three times a week, and she assisted in taking care of him from May until he died. She says: "In my opinion, there was no time before June 1 that he could not transact ordinary business."

John H. Kimball, the husband of the defendant, testified, that Hugh Kennedy came to his house, without the knowledge of himself or wife that he was coming, in 1879. He was taken sick in February following. For the first two months of his illness he thought he would recover,—after that, he expected to die. He details how Murphy was sent for to draw the will, and how O'Donnell was afterwards sent for in regard to the deed, and that it was of his own volition, etc., and that his mind was all right. On the other hand, the complainant Eliza Cunningham testified, that she was with her father at the time he died, and for three weeks before; that during that time she was in his room six or seven times a day; that he recognized her only about three times; he did not talk rationally, at all times; he did not talk much; they would ask him questions, and sometimes he would answer and sometimes he would not; and she details some flighty and incoherent remarks that he made at one time. He lay

all the time in a slumber; when roused would wake with a wild look, say one word, and drop off again into slumber. She says that no medicine was given him while she was there but whisky; that the defendant gave him a common-sized glass nearly full,—always half full,—five or six times a day, and she said he drank a quart a day. The witness also further testified, that defendant did not allow her to nurse her father, and tried to prevent her talking to him. In the opinion of the witness, he was not able to comprehend the most ordinary business matters. She says, also, the defendant was a bad daughter, not a favorite of her father, and that she did not care for him well, and that he was not treated right. She admits that she does not feel kindly towards the defendant.

Three weeks before the death of her father, which was on the 10th day of August, would not be earlier than the 20th of July, lacking but a few days of being three months after the execution of the deed. Recalling the testimony of Dr. Hosmer, that Kennedy "exhibited no signs of mental disorder existing prior to his illness, except such as naturally produced by his bodily ailments,—nothing in his case likely to produce mental disease more than ailments producing similar bodily and nervous prostration," there is no conflict between this testimony and that of Murphy and O'Donnell, that Kennedy had sufficient mental capacity to execute the deed at the date it was executed. When this witness was with him he was in the last stages of a lingering disease, and stupor and weakness were the necessary results upon a mind which otherwise would be unclouded and bright. That he was not *then* competent to make a deed, proves only that fact; but no deed was *then* made. The complainant Ann Cuddy saw her father four times in February, then, again, saw him in March, for a few hours, then again in July, and she does not think he was at any of these times of sufficient mental capacity to transact business. How his mind was, in April, she does not, therefore, know; and she details flighty remarks that

he made in her presence. She thinks the defendant tried to prevent her talking with him. She also says that the defendant was not a good and kind daughter. She says the defendant told her that her father drank a quart of whisky a day. Saw him get no medicine, and saw the defendant give him a half a glass of liquor, sometimes less, five or six times a day. Both this witness and the preceding one say that they were on affectionate relations with their father, and this witness says that she never heard him, when well, express an intention to give his property to the defendant.

Mary Daley testified that she saw Hugh Kennedy in March, two or three times, and once in April or May, and she says: "In the four times I saw him his mind was not fit to do business of any kind." She says that defendant said she gave him stimulating drink; that she used a quart a day, but did not say what she used it for. The witness shows that Kennedy talked with difficulty, on account of the asthma. She did not talk much to him, as it seemed to give him pain.

John Kennedy testified that he was at the house of the defendant from the 15th to the 17th of March. He spoke to Kennedy and said, "Uncle, I am sorry to see you sick, and he said, 'I know that John,' and asked how was my father, and that was all that he said. He went into a kind of a doze. I had no other conversation with him. I saw him several times, and he did not appear to recognize me,"—all of which only proves that the witness, for two days, was about the house of a sick man, who, because of his sickness, or for some other reason, was not inclined to talk.

The complainant James Cuddy testified, that he saw Hugh Kennedy in the middle of February, sick abed, and not able to turn himself, drowsy and stupid. Saw him again in February, four or five days afterwards; his face pale; had a sharp, piercing look in his eyes. Saw him last of March. Asked him how he felt. He said he would be well in a few days. Next saw him in July; was thin, weak, pale and drowsy. Did not

think him able to talk much. Saw him get whisky every time was there, half glassful. Heard defendant say that he used a quart a day. Gives some flighty talk of Kennedy that he heard. Says relations of father with daughters were friendly. Kerwin and family are in Kansas, and suffering for something to eat. On cross-examination said: "I am not sure that defendant said he used or drank a quart of whisky a day."

A letter written for the defendant to Ann Cuddy, dated April 2, and a letter written by the husband of the defendant, with her consent, to John Kerwin, on the 20th of August, A. D. 1880, containing admissions that Kennedy was prostrated, and unable to help himself from an early period in his sickness, were also read in evidence. And this embraces the substance, as we understand the record, of all that was proved to sustain the bill.

There is no evidence tending to prove that the defendant even *requested* a will or deed to be made in her favor, and there is evidence affirmatively showing that it was purely voluntary on the part of Kennedy. He was not even solicited to make her house his home. But Cuddy having sued him, and obtained a judgment against him on the 24th of November, A. D. 1879, which Kennedy seems to have regarded as unjust, he ceased to live with him. One of Kennedy's daughters lived in Kankakee county, and another in the State of Kansas, and the defendant only residing near by, it was quite natural that, being on good terms with her, he should go to her house, as he did. It is not improbable that his feeling against Cuddy was extended to Cuddy's wife, and unjust as, in a moral sense, this may have been, it furnishes no excuse for setting aside the deed. Morrison, the justice of the peace before whom the suit of Cuddy against Kennedy was tried, says: "Cross words passed between both parties at the time. Mr. Kennedy said he could get that judgment out of him. All he got after that, he was going to cut him off—something like that."

We have omitted to notice the testimony of another physician examined on behalf of the complainants, because we do not regard it as of controlling importance, and Mrs. Downey testifies that when that physician visited Kennedy, he, witness, was too drunk to attend to business,—that he could hardly stand up. It has been seen that the use of whisky by Kennedy was under the direction of his attending physician, Dr. Hosmer. The defendant's husband testified that whisky was never given to Kennedy except at his request, and then only two or three tablespoonfuls at a time; that he gave him liquor, and his wife gave it to him, and Mrs. Cuddy gave it to him two or three times while she was there; that they used whisky with which to bathe him; that he has helped to bathe him with it two or three times in twenty-four hours. Mary A. Wood testified that he was bathed every morning with water and whisky; sometimes a pint of whisky was rubbed on his person with a sponge. That he was at all times under the influence of whisky is effectually disproved by the evidence.

The statement in the testimony of the complainants that Kennedy was not well nursed and cared for by the defendants, is effectually disproved by the evidence of other witnesses who have no apparent motive for speaking untruly. Thus, Dr. Hosmer says: "He had the best of nursing and care. Mary Kimball is the best nurse of my acquaintance. He was in a good-sized room for such a house, on a good bed, clean and neat. Surroundings as to comfort and cleanliness, good." Peter Downey said: "I have seen many sick men, and never saw a sick man better taken care of for comfort and cleanliness." Eliza Foley said: "He received the best kind of care." John H. Foley testified to substantially the same. William Stapleton said: "He seemed to be cared for in the tenderest manner, with a great deal of affection, and everything about him exquisitely neat and clean." Mary A. Woods shows that very great care was taken in nursing him, and she

and several other witnesses testify that Kennedy frequently spoke gratefully of the kind attentions he received.

It is to be taken into consideration that the complainants, honest as their intentions may be, testify under feelings and motives calculated to bias; and yet everything to which they testify may be conceded, and it will not follow that Hugh Kennedy was mentally incompetent to make a deed when this deed was made. Neither of them was present at that time. What the condition of his mind then was, they do not necessarily know. They do not even show, affirmatively, that at every time they saw him before that period he was incapable of making a deed. Dr. Hosmer says: "Persons in his condition, dying of general debility, are apt to be stupid and weak at times, and other times revived, and more clear and active, mentally." And according to the evidence of Murphy and O'Donnell, whom we are not warranted in disbelieving, it was at a time when he was "revived, and more clear and active, mentally," when the deed was made. Seeing him in a paroxysm of pain, or in the stupor following relaxation from pain, could afford no accurate knowledge of the state of his mind at other and more favorable periods for mental operations.

It may be that Kennedy felt more grateful toward the defendant for her attentions than they deserved, and less kindly toward his other daughters than he should. There may have been many matters in the history of their lives and his, and many present considerations also, that, to have been entirely just, in a moral sense, should have been present in his mind and carefully weighed before he made the deed; but the law does not compel men to be entirely just, in a moral sense, in their gifts to their children. Neither wills nor deeds can be impeached because of injustice, in a moral sense, alone. If the party be sane, he may, from caprice, causeless malice or foolish prejudice, cut off his children and give his property to strangers. The moral injustice or caprice, in such cases,

may be considered as a circumstance on the question of insanity, but it is not a controlling one; and if, from other evidence, it be clear the party is sane, it is of no moment whatever.

There is, especially with juries, and, it may sometimes be, even with courts, a disposition, originating in the better feelings, to step in, where a parent or other relative does not make an equal division, or a satisfactorily meritorious division, of his property, and make the proper division for him. This is not warranted by the law. The property owner, unless an idiot or lunatic, must be allowed to make his own division and disposition of his property. Nor does the fact that a party is physically unable to look after his property, or that his mind is enfeebled by age or disease,—if not to the point of lunacy or absolute imbecility,—take from him this power. It may be that such weakness makes him an easier victim of undue influence, and it is proper to consider it in that view; but weakness and opportunity for undue influence do not prove that undue influence has been exercised. But there is nothing startling, in its unreasonableness, in what Kennedy here did. His nursing imposed great labor and care. For several months before he died he was bedfast, and unable to control his bowels. This, of course, necessitated frequent removals from his bed and changing of linen, bathing, etc., and imposed a kind and amount of labor and care that it would be difficult to buy. In his remark to O'Donnell he showed that he fully realized this, and acted upon it. He said "he might linger a long time; he was a great burden to Mrs. Kimball, and she was very kind to him. He said Mr. Cuddy was fond of lawing, and would make her trouble."

The decree below is reversed, and the cause remanded, with directions to the court below to dismiss the bill.

*Decree reversed.*