## J. Smith Johnson et al., Plaintiffs in Error, v. Samuel H. Watson et al., Defendants in Error.

1. EVIDENCE—*burden to establish want of mental capacity.* In an appeal to set aside a lease upon the ground that the lessor had been over-reached through and on account of his mental incapacity, the burden of proof is upon the complainant.

2. EVIDENCE—*what does not establish mental incapacity.* Impairment by age is not sufficient if the contracting party still retains a full comprehension of the meaning, design and effect of his acts.

3. VERDICTS—*when not set aside.* A court cannot undertake to relieve parties from their contracts or to make new contracts for them unless it appears from the evidence that such parties were, in fact, incapable of transacting the business.

4. APPEALS AND ERRORS—*when finding of chancellor not disturbed.* The finding of a chancellor will not be set aside as against the evidence unless clearly and manifestly so.

Bill in chancery. Error to the Circuit Court of Jefferson county; the HON. J. R. CREIGHTON, Judge, presiding. Heard in this court at the October term, 1911. Affirmed. Opinion filed March 21, 1912. *Certiorari* denied by Supreme Court (making opinion final).

NOLEMAN & SMITH, H. CLAY HORNER and WILLIAM T. PACE, for plaintiffs in error.

ALBERT WATSON, G. GALE GILBERT and JOEL F. WATSON, for defendants in error.

MR. JUSTICE McBRIDE delivered the opinion of the court.

Plaintiffs in error filed a bill to set aside and have declared null and void certain leases hereinafter described and for other relief. The defendants, lessees,

answered said bill and a trial was had thereon at the October term, 1910, of said court, and a decree rendered in favor of the defendants in error; from which decree plaintiffs in error prosecute this writ.

On April 7, 1884, Susanna Johnson and Washington S. Johnson executed a lease to Samuel H. Watson for a part of lot 39, block 13 in Storm's survey of the city of Mt. Vernon, Illinois, for a term of ten years beginning May 1, 1884, for which Watson agreed to pay as rent $1,000, payable annually and in installments of $100 each. Said lease provided that at the expiration of the term thereof the first party may purchase such buildings as the second party may then have erected thereon, at a cash value fixed by three disinterested men, under oath, one of whom shall be chosen by each party hereto and the third by the other two; or if they shall not elect to so purchase, this lease shall be extended for the further period of ten years on the same terms, provided that if at the expiration of any period of five years thereafter the first party shall demand a higher rate of rent than $100 per annum for said premises, then three disinterested persons to be chosen as hereinbefore provided, shall ascertain and fix the rental value of said premises, which value so fixed shall be binding upon the parties hereto until the final termination of this lease, unless modified by similar arrangements which may be made at the termination of each or any period of five years after the expiration of the original term of this lease.

And it was further provided by such lease that the taxes or special assessments levied on said lots shall be paid by the first parties and that all taxes or special assessments levied or assessed on any buildings erected thereon shall be paid by the second party. That prior to May 1, 1891, the said Washington S. Johnson had become the sole owner of the real estate men-

tioned in said lease and in the leases hereafter described, by reason of the death of his mother, Susanna Johnson, and his brother, Fletcher Johnson. That on May 1, 1891, the said Washington S. Johnson executed a lease to John H. Rackaway for a term of 13 years for a portion of Lot 39, all of Lot 40, in said block 13, for a yearly rental of $242 and containing a provision for the renewal of the lease, similar to the former, except the period for renewal and the option to increase the rent was to be at the end of each period of 13 years. That on October 23, 1900, Washington S. Johnson executed a lease to L. L. Emmerson for 25 feet of said lot 39, for a term of 13 years at an annual rental of $125, and contained provisions similar to that of the other leases except that the period for the renewal of the lease and to exercise the option to increase the rent was made 13 years. Upon the said last mentioned lease appears the following endorsement:

"Mt. Vernon, Ill., Sept. 22, 1906.

Consent is hereby given for an extension of 13 years from Oct. 23, 1913, to Oct. 23, 1926, at an annual rental of $150.00.

W. S. JOHNSON    (Seal)<br>Accepted<br>L. L. EMMERSON    (Seal)

J. H. RACKAWAY, witness."

It is alleged in the bill that between the time of the making of the first lease and second lease above referred to, that Susanna Johnson, mother, and Fletcher Johnson, brother of Washington S. Johnson, died and that they had been the advisers of the said Washington S. Johnson in the making of the first lease and in the transaction of the business.

It is further alleged in the bill, and appears to be sustained by the evidence, that the said Washington S. Johnson did not at any time take advantage of the

option given him in said leases, or any of them, to have the rental value of said property re-appraised upon the expiration of any of the periods.

The bill further alleges that at the expiration of the first period of ten years of the Watson lease, by reason of the mental incapacity of the said Washington S. Johnson and his inability to understand and comprehend the nature and substance of said lease or contract, he did not and could not exercise his said option at the expiration of the first or second periods of ten years, and purchase the said buildings and improvements thereon, or have the rent of said premises re-appraised and fixed as provided might be done by such lease, and that said Watson well knowing the mental weakness of the said Johnson and the trust and confidence reposed in him by said Johnson, and contriving to overreach and defraud him continued in possession of said premises, paying the annual rental of $100 during all of said periods. That the said John H. Rackaway was a friend of the said Johnson and a prominent business man, and one with whom said Johnson frequently consulted in regard to his business affairs, and in whom he reposed confidence and trust and well knowing the mental incapacity and weakness of said Johnson, and the trust and confidence imposed in him by the said Johnson, and contriving to wrong and defraud him fraudulently induced the said Johnson to enter into and execute the pretended lease above described as having been made to the said Rackaway. That at the expiration of the first period of the Rackaway lease, to wit, May 1, 1904, by which the said buildings could be purchased or the rents re-appraised said Johnson did not then and there have sufficient mental capacity to know and understand the nature of said contract, and that it was to his interest to purchase such buildings, or have said rental re-appraised. That on October 23, 1900, said

L. L. Emmerson, in whom said Washington S. Johnson reposed trust and confidence, conspired and contrived with the said J. H. Rackaway to overreach and defraud said Johnson, and by the assistance of said Rackaway induced the said Johnson to make the said lease to the said Emmerson, and procured the said extension of said lease in September 1906, for a period of 13 years from October 23, 1913, and that the said Johnson was fraudulently induced to sign said endorsement under the impression it was a mere promise on the part of Emmerson to increase the rent during the second period mentioned in the lease; whereas, it was in fact an effort to secure an extension.

The bill also alleges that the endorsement was within the Statute of Frauds and void, and invoked the Statute of Frauds to avoid said extension.

The bill then avers that the values of property have increased very much since the execution of the said leases and that the rental values have also greatly increased, and that the taxes on said premises have increased, and that the revenues derived from said premises on said leases amount to less than one per cent upon the real valuation of the lands; that by reason of the relation existing between said Johnson and the said Watson, Rackaway and Emmerson, respectively, and by reason of the mental incapacity of the said Johnson, the renewal clauses of the said leases of Watson and Rackaway were not binding upon Johnson and his heirs; and by reason of the mental incapacity of the said Johnson and the confidential relation with Emmerson, that the Emmerson lease was void. The bill then makes an offer to have the buildings and improvements appraised and that upon a sale that the said Watson, Rackaway and Emmerson be reimbursed for the value thereof, and asks for a partition of the premises; and that the said pretended leases together with the extensions may be declared null and void and a cloud upon the title of the plaintiffs.

The defendants Watson, Rackaway and Emmerson answered said bill admitting the execution of the leases but denying that Johnson was incapable of managing and caring for his own estate or of appreciating and understanding the leases in question because of his mental incapacity; and deny that each of them contrived to wrong or defraud the said Johnson or induce him to execute said leases for the purpose of defrauding him, but that such leases and extensions were each made of his own volition. And deny that the consideration for said leases at the time they were entered into was insufficient or inadequate, and aver that they erected valuable and permanent improvements upon the said land so leased; that the increased rental value of the said premises has advanced within the past few months but such advancement was caused by the securing of an additional industry,—the Mt. Vernon Car Manufacturing Company, at a cost to the citizens of about $125,000, and that without such improvement the real estate in question would have become of little or no value, and that the rent agreed to have been paid would have been high, and even excessive and deny that such leases and extensions are void; and deny that the complainants are entitled to the relief asked for.

It is contended by plaintiffs in error that the trial court erred in finding that Washington S. Johnson was of sound mind and memory at the time of the execution of the several leases and extensions, and at the periods provided in the respective leases by which a re-appraisement of the rental value of the property could be had. Upon this question there were about 28 or 30 witnesses examined upon behalf of the plaintiffs in error, and about 26 witnesses on behalf of the defendants in error. Many of the witnesses for the plaintiffs in error described the deceased, Washington S. Johnson, as a man physically weak, somewhat eccentric, quiet in his ways, one who read a great deal,

was posted upon the early history of the country, read the newspapers and kept informed upon the incidents of the day; some of them stating that he talked intelligently about such matters but that he had no knowledge of business affairs, and many of them stating that he was not of sufficient mental capacity to understand the ordinary business transactions, and to comprehend the leases in question. Many of the witnesses for the defendants in error stated that he was physically weak but that he was a man of fair business ability; read a great deal, kept himself posted upon the affairs of life and matters generally, and that he was capable of transacting the ordinary business affairs of life, and had sufficient mental capacity to understand and appreciate the terms of the leases in question.

The burden, in this case, was upon the plaintiffs in error to show the incapacity of the said Johnson, as alleged in their bill. It is sought to avoid the force of this position by saying that a fiduciary relation existed between these several defendants and the said Johnson, or at least such a relation existed between them, considering the mental weakness of Johnson, that the burden of showing that these several transactions were fair and that Johnson was not over-reached in the making of them and the extensions or in their neglect to have the lease rentals re-appraised. We fail to find sufficient evidence in this case to warrant us in saying that any such a relation existed between these defendants and the said Johnson, and cannot concur with counsel in their view in this matter. In the absence of undue influence, before a decree could be rendered in favor of plaintiff he must show such a degree of mental weakness as renders a party incapable of understanding and protecting his own interests. Impairment by age is not sufficient if the contracting party still retains a full comprehension of the meaning, design and effect of his acts. A court cannot undertake to relieve parties from their contracts or make

new contracts for them unless it appears from the evidence that such parties were in fact incapable of transacting the business.

In Kimball v. Cuddy, 117 Ill. 213, the Supreme Court of this State said: "The property owner, unless an idiot or a lunatic must be allowed to make his own division and dispose of his property. Nor does the fact that a party is physically unable to look after his property, or that his mind is enfeebled by age or disease, if not at the point of lunacy or absolute imbecility, take from him this power. It may be that such weakness makes him an easier victim of undue influence, and it is proper to consider it in that view; but weakness and opportunity for undue influence do not prove that undue influence has been exercised."

In Willemin v. Dunn et al., 93 Ill. 511, the court said: "Mere mental weakness will not authorize a court of equity to set aside an executed contract, if such weakness does not amount to inability to comprehend the contract." And this doctrine is fully sustained by the court in Argo v. Coffin et al., 142 Ill. 368; and Crosby v. Dorward, 248 Ill. 471.

It may be that if contracts were made at the present time with the knowledge of the increased valuation of the property of Mt. Vernon, that such could be made more advantageous to the property owner than these contracts were. Even the wisest could not determine the rapid increase in the values and rental values of such property that may have existed in this case, as such increases in valuation are easily attributable to outside influences over which neither of the contracting parties would or could have control.

It is quite probable that had values remained as they were at the time the contracts were made, that the leases would not have been regarded as unfair. The property at that time was vacant, produced no income, and the making of these leases did at least make it self-sustaining and productive of some revenue, which

was undoubtedly an advantage to Johnson and may have operated as an inducement to secure lettings at even lower prices, and under such circumstances we cannot say that the making of such leases or the failure to have the re-appraisement at the stated times provided therein could be regarded by the courts as evidence of mental imbecility. Argo v. Coffin et al., *supra*.

Upon the Emmerson lease appears the following endorsement, to wit:

"Mt. Vernon, Ill., Sept. 22, 1906.

Consent is hereby given for an extension of thirteen years from Oct. 23, 1913, to Oct. 23, 1926, at an annual rental of $150.00," and signed by both parties.

It is contended by counsel that this endorsement is within the Statute of Frauds and void; that it is meaningless by itself and does not describe the matter or thing intended. We cannot agree with counsel in this contention. We are of the opinion that when this endorsement was made upon the lease by the parties, and both parties signed it that it became a part of the lease and that it must be construed in and as a part of the lease. If we are right in this position then the premises were sufficiently described and the endorsement is not within the Statute of Frauds.

The evidence in this case was taken in open court. The chancellor had the opportunity of observing the witnesses and determining better what weight should be given to the testimony than can be done by a court of review, and as has been frequently said by the Supreme Court of this state, unless the finding of the chancellor is manifestly against the weight of the evidence it should not be disturbed. Pinkstaff v. Steffy, 216 Ill. 406.

We cannot say that the decree in this case is of that character that would warrant this court in setting it aside, and the decree of the Circuit Court is affirmed.

*Affirmed.*