(No. 13043.—Reversed in part and remanded.)

CARRIE McAYEAL et al. Appellees, vs. JOHN HILLISON, Appellant.

*Opinion filed February 18, 1920.*

1. DEEDS—*old age and disease do not necessarily incapacitate grantor to execute a deed.* While age and disease are proper elements to be considered on the question of mental capacity to transact business, the mere circumstance that the mental powers have been impaired by age or disease is not, alone, sufficient to invalidate a deed if the grantor fully comprehends its meaning and effect and is able to exercise his will in executing it.

2. SAME—*what mental weakness will invalidate a deed.* The mental impairment that will render a deed invalid must be to the extent that the grantor is incapable of comprehending what he is doing and of knowing the nature and effect of his act.

3. SAME—*fact that third party suggests making deed does not affect its validity.* Where a grantor, in making a deed during his last sickness, carries into effect a purpose he had in mind before he became ill, the fact that the making of the deed is first suggested by a third party does not affect its validity, if the grantor is able to comprehend his property and understand the nature and effect of his act.

4. SAME—*burden is on complainants to establish invalidity of deed.* The burden is on the complainants seeking to set aside a deed in a partition suit to prove the allegations in their bill that the grantor was mentally incapable of making the deed.

APPEAL from the Circuit Court of Champaign county; the Hon. FRANKLIN H. BOGGS, Judge, presiding.

DOBBINS & DOBBINS, for appellant.

M. H. CLOUD, and L. F. WINGARD, guardian *ad litem,* for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

This was a bill for partition originally filed by Carrie McAyeal, as an heir of Thom Hillison, deceased, complainant, against John Hillison and other heirs of Thom Hilli-

son.    Subsequently the bill was amended so as to make some of the other heirs also complainants.    The bill alleged Thom Hillison died intestate October 29, 1917, leaving Carrie McAyeal, his sister, John Hillison and Mons Hillison, his brothers, and six children of a deceased sister, as his only heirs-at-law.    The bill alleged deceased was the owner in fee simple of 160 acres of land in Champaign county; that what purported to be a deed conveying to John Hillison 80 acres of said land was made October 15, 1917, but that at the time it was executed Thom Hillison was sick in a hospital and so mentally weak and deranged in mind as to be wholly incapable of transacting any business or understanding the nature and effect of his act.    The bill prayed that the deed be set aside and the land partitioned.    John Hillison answered, denying that deceased was mentally incapable of making the deed and understanding the nature and effect of it.    The cause was referred to the master in chancery, who heard the testimony and reported recommending a decree as prayed.    Exceptions to the report were overruled by the chancellor and a decree entered setting aside the deed and for partition of the entire 160 acres, from which decree John Hillison has prosecuted this appeal.

Thom Hillison was about seventy years old.    He came to this country from Norway many years ago and first lived in Ford county, about three miles from the village of Elliott, a Norwegian settlement.    He was never married. For a time his father, brothers and sisters lived with him. About 1890 he bought a farm of 160 acres in Champaign county, six miles from Elliott, and moved there.    Neither of his sisters lived there with him, but his two brothers John and Hill lived with him and helped with the farm work until Hill's death, about 1910, and John continued to live there until Thom's death.    It is undisputed that John, from the time he was old enough, worked on the farm all the time and received nothing for his labor except board and clothes "and a few dollars now and then."    Thom was

headstrong, of taciturn disposition, talked very little and seldom volunteered conversation except about necessary business. He would talk more freely in Norwegian than in English. He drank some and would talk more when drinking than at other times. He would use profane language at times without regard to where he was or the presence of ladies. The sisters had married and neither of them lived with Thom for more than twenty years. The father died many years ago, and the brother Mons has been in an insane ayslum for many years. Hill was accidentally killed some years before the death of Thom. There is no controversy that prior to his illness in 1917 Thom was a strong character, mentally sound and capable. He had not been seriously sick prior to his last illness. Three or four months before he died he called a physician, Dr. Donovan. The doctor testified he was suffering from an asthmatic condition, and after treating him three or four weeks the doctor took him to Mudlavia Springs, Indiana. He remained there about three weeks and then returned home, and the doctor treated him there a few weeks. His condition became worse, and October 7, 1917, the doctor, a neighbor, Dwight Day, and Julia Halverson, then and for several years previous the housekeeper at the Hillison farm, took Thom in an automobile to a hospital in Bloomington and left him there for care and treatment. He was suffering from what is commonly called bladder disease and what appeared to be dropsical blood poison near his feet and ankles. Dr. Chapin, a member of the staff at Brokaw Hospital, in Bloomington, where Thom was taken, testified that when he was brought to the hospital an examination disclosed he had degenerative disease of the blood vessels, known as arterial sclerosis, and as a result of that, interstitial nephritis and a condition of the heart known as myocarditis,—heart degeneration. He was uræmic and dropsical, the skin of his legs was sore and he developed gangrene of the legs and feet to some extent. His uræmic condition

291—21

inclined him to be stupid and at times it was difficult to get him to comprehend. On October 15, 1917, W. A. Cameron, Dwight Day and Julia Halverson visited Thom at the hospital, and while they were there the deed to John Hillison for the west half of the quarter section constituting the Hillison farm was executed. It was witnessed by Julia Halverson and Day and was acknowledged by Cameron, a notary public.

The question for determination is whether the proof sustained the allegations of the bill that Thom Hillison was so mentally weak and deranged as to be wholly incapable of transacting any business or knowing and understanding what he was doing. While age and disease may and do impair the mind and are proper elements to be considered on the question of mental capacity to transact business, the mere circumstance that the mental powers have been impaired by age or disease is not, alone, sufficient to invalidate a deed if the grantor fully comprehended its meaning and effect and was able to exercise his will in executing it. The mental impairment that will render a deed invalid must be to the extent that the party making it was incapable of comprehending what he was doing and knowing the nature and effect of his act. Whether the deed here assailed is valid or not must be determined from the testimony of the witnesses testifying for the respective parties.

Thom Hillison at the time of his death had been in the hospital where he died since October 7, 1917. Dr. Chapin had been from 1893 to 1897 a physician in the State Hospital for the Insane at Jacksonville and a member of the hospital staff of Brokaw Hospital sixteen years. It is a hundred-bed hospital. Thom made outcries indicating he suffered pain. He was noisy and disturbed other patients, so that he had to be removed to the ground floor. The doctor prescribed for him and gave him more or less morphine and some heroin. He testified that from his observation of the patient, in his opinion he was not mentally

capable October 15, 1917, to transact business of impor-
tance,—any business that would require a material amount
of judgment,—and that was his condition all of the time
the doctor saw him at the hospital. In the doctor's opin-
ion Thom was not mentally capable on October 15, 1917, to
appreciate the importance of executing a deed to 80 acres
of land worth $16,000 or more. He was not capable of
transacting the simplest business understandingly at any
time the doctor saw him. He was not in a stupor but was
stupid, and that condition gradually increased. At times
he appeared to intelligently realize what was said to him
and to answer questions. He could carry on a conversa-
tion when limited to direct questions and answers, but it is
doubtful whether he knew the objects of his bounty if he
wished to dispose of his property. The doctor never tried
to carry on a conversation with the patient further than to
inquire about his ailments. The doctor never talked with
him about what property he had or who were the members
of his family and was never present when his brother John
visited him. He never made any effort to find out whether
he understood his business affairs, had no knowledge of
his habits or characteristics, but most of the talk was about
his ailments.

Ruth Carson was employed as a nurse in Brokaw Hos-
pital and took care of Thom Hillison from October 8 to 11.
She testified that part of the time he was restless but slept
under the influence of opiates. When he was awake wit-
ness tried to converse with him but he would not always
talk. Sometimes he answered questions and sometimes he
did not. Witness never tried to talk to him about anything
but his condition. Sometimes he answered questions satis-
factorily and sometimes he did not. Witness did not think
his mental condition such that "he could take care of any
business." He was not rational most of the time. Witness
never saw him until he became her patient and knew noth-
ing about him. He was quiet when not complaining of

pain. Witness could not understand him when he talked Norwegian. Sometimes he talked rather rough. He never said anything about his family or his property. The question whether he was able to attend to business never entered witness' mind. He was anxious to know whether the doctor thought he would recover. He would not notify witness when he was going to have a movement of the bowels or kidneys.

Matilda Strohmeier, a nurse in Brokaw Hospital, had constant charge of Hillison from October 11,—seven days. She testified he was in a semi-conscious condition most of the time. He would groan and moan a good deal. Witness gave him heroin, morphine and atropin to relieve pain and cause sleep. He told witness he was not married and that he lived at Elliott with his brother. He was not inclined to talk. Dr. Donovan and another man called at the hospital to see Hillison on October 14 and stayed thirty or forty minutes. Witness left the room while they were there. Cameron, the housekeeper and a farmer visited him October 15 and the following day two men called to see him. The man with Cameron and the housekeeper on October 15 said he was a neighbor and introduced Cameron and the housekeeper to the witness. Cameron asked Hillison if he knew him, and he said, "Mr. Cameron." Witness thought the housekeeper talked and that the neighbor talked to him about his condition. Witness went out of the room into the corridor. They remained in the room thirty or forty minutes. Cameron asked witness where he could find a pen and ink, and witness showed him the desk where he would find them. She saw Cameron writing at the desk but heard nothing that was said afterwards. After Cameron finished writing he went into the room with a paper and they all remained there ten or fifteen minutes. When they came out they said nothing about having transacted any business. After they left, witness returned to the room where Hillison was and asked him who was there. He said he did

not know,—that Cameron was one. Witness asked if it was the banker named Cameron, and he said it was. She asked if the woman was his sister, and he said no; she was the housekeeper. Witness asked who the other man was, and he said he did not know. Witness testified that in her opinion Hillison was not in his right mind all the time; that there was very little of the time he was responsible for what he said or did. In the opinion of witness he was not mentally capable of understanding his surroundings and what was going on October 15, and witness would not consider he had mental capacity to transact ordinary business or determine the proper beneficiaries of his bounty. Witness made little effort to talk to Hillison. She asked him if he was a farmer and if he had any relations, and he answered the question correctly. He was not talkative, said very little except to make complaint, and rarely complained. He would groan and appeared to suffer pain.

Lulu Justis was a graduate nurse and superintendent of the hospital. She remembered Hillison and saw him every day while he was in the hospital. He required a good deal of attention and was noisy because of his unconscious condition. If he had not been in that condition he would have been a different patient at times. She never saw him at any time when she thought his mind was clear. His condition was not different the day Cameron and some other people called from what it was at other times. In witness' opinion he was not competent to transact ordinary business at any time while he was in the hospital. She never talked with him to amount to anything. Her attention was not directed to his mental condition while he was in the hospital.

On behalf of appellant Dr. Donovan testified he had known Hillison eleven or twelve years; that he had never been sick prior to his last illness, when the doctor treated him two weeks and then took him to Mudlavia Springs, Indiana, which was three or four months before his death. Before that time the doctor saw him very often and had

business transactions with him. Hillison would not talk much, only answered questions and never carried on a conversation. He was of that disposition all the years that the doctor knew him. He would use rough language without regard to who was present. After Hillison returned from Mudlavia Springs, where he stayed about three weeks, the doctor treated him at his home two or three weeks, when on the doctor's advice he went to the hospital at Bloomington. Hillison was driven to the hospital in an automobile, the doctor accompanying him. The doctor visited him at the hospital. He described the disease Hillison was suffering from and said it did not necessarily affect the mind and in his opinion did not affect his mind. In witness' opinion when Hillison went to the hospital he was of sound mind, and when he visited him on the Sunday following, which was the day before the deed was made, his mind was sound. The witness was of opinion he had mental capacity then to know his property, what it was worth and what he wanted to do with it, and the witness expressed the belief that on the day he saw him last he could not have been induced to dispose of his property in a way he did not want to dispose of it. Julia Halverson and Dwight Day went with witness and Hillison when he was taken to the hospital. The doctor thought he would live longer at the hospital but thought he would not recover.

W. A. Cameron testified that he was in the banking business at Elliott, was formerly a member of the legislature and twice chairman of the board of supervisors of Ford county. He had known Hillison thirty or forty years and had transacted business with him for more than twenty years. Hillison was a man who never talked much and when in company of other people who were talking would not take part in the conversation unless asked a question. He would drink a little and would swear without regard to who was present. John Hillison planted the corn, cut the grain, husked the corn and hauled the grain to market.

During the last few years they divided the grain money but before that it was Thom's. Thom ran a threshing machine. Witness went with Julia Halverson and Dwight Day to see Thom at the hospital the day the deed was made. They all went into the room where Hillison was and were there about two hours. All of them talked with him and he answered the questions asked. He recognized all the party and shook hands with them. After they had been with him about a half hour witness spoke to him about the property and inquired if John was not interested in the land and entitled to half of it. Hillison answered that was correct and said in answer to questions that the title was in his own name. Cameron suggested to Hillison that as he might die he ought to make a deed or fix some paper showing his brother John had a half interest. Hillison said he would but did not want to deed John all of the land but wanted to deed him the 80 acres on which the house was located; that he wanted to divide the 160 acres north and south and give John the east 80. Witness prepared the deed and explained to Hillison what it was, and he said, "All right." He was ready to sign it, but they found it was difficult to raise him up so he could sign it himself and witness suggested he could sign it by his mark, and he did so. Cameron and the parties with him remained with Hillison and talked to him a half or three-quarters of an hour after the deed was signed. Cameron testified that in his opinion Hillison was mentally able to transact business and fully comprehended the meaning and effect of the deed; that he was able to understand and comprehend his property and its value. Before going to see Hillison at the hospital witness had told John that he ought to have some paper to show his interest in the property but the visit was not made at John's suggestion or request.

Dwight Day, a farmer whose land joined the Hillison land, testified he had known Thom and John over twenty years. They lived on the Hillison farm. John and his

brother Hill did all the farm work while Hill lived and after his death John did it. Julia Halverson was their housekeeper twelve or thirteen years. Hillison never talked much except to answer questions. He was headstrong, and witness never heard of anyone cheating him in a business transaction. He ran a corn sheller and threshing machine. Witness went with Hillison when he went to Mudlavia Springs and visited him while he was there and saw and talked with him at his house after he returned from the springs. When he was taken to the hospital at Blooming- ton witness went with him at his request. Hillison was suffering too much pain to talk much on the trip. Witness went to see him at the hospital the day the deed was made. Julia Halverson asked him to go with her and Cameron. When they went into Hillison's room he knew them, called them by name and shook hands with them. Witness talked with him and asked how he was getting along. While Cameron was preparing the deed Julia Halverson talked with him in Norwegian but witness did not understand that language. Hillison answered her in Norwegian. Cameron asked Hillison if he did not think John was entitled to part of the land and if he would be willing to deed all of it to John, and he said he would not. Cameron asked if he would deed John half of it, and he said he would. Cam- eron asked how he would divide it, and Hillison, the wit- ness thought, said north and south; that he would give John the land where the buildings were. Cameron drew up the deed, and when they undertook to raise Hillison up to sign it he appeared to suffer such pain that they did not raise him up but he made his mark and Cameron wrote his name to the deed. Witness and Julia Halverson signed it as witnesses. In the opinion of the witness Hillison was mentally able to understand what he was doing in making the deed and that he was conveying one-half his land to his brother John. If he had not wanted on that day to make the deed he could not have been induced to make it.

He was not acting under the influence of anyone when he made it.

A. P. Hanson testified he was a Norwegian and spoke that language. He had known Hillison twenty-five years. He did not talk much in the English language. Witness worked for him in the spring of 1916. Hillison told him John was more entitled to the farm than anyone else because he had worked there ever since he was old enough to work and had never received anything for his work except his board and clothes and a few dollars now and then. He was then troubled with rheumatism, swelling of the feet and his eyes were affected. He said he was good for many years yet; that if he should die John was the one to get his property, but he was not thinking of dying then. He said he had never paid John anything but his clothes, and said John had begun farming the land on shares in 1915. Witness saw and talked to Hillison after his return from Mudlavia Springs. He was mentally sound and able to transact and understand ordinary business.

K. S. Knutson, a Norwegian by birth, had known Hillison fifty years. He testified John was the "main spoke in Thom's wheel" and had worked on the farm ever since he was old enough to work. Hillison had a mind of his own. He never talked much except to answer questions. The last time witness saw him was at his home a month or so before his death. He was then walking around. In the witness' opinion he was mentally capable of transacting ordinary business and understanding the effect of making a deed to his property.

L. J. Hanson, a farmer, testified his father was of Norwegian birth. Witness had known Hillison twenty-five or thirty years and had transacted business with him. Witness last saw Hillison at his farm in September before his death and was with him three or four hours. He was of sound mind and able to understand the nature and effect of making a deed of his property. He would do as he

wanted to, no matter what others might want. He could not be overreached in a business transaction or influenced to dispose of his property in a way different from the way he wanted to dispose of it.

S. A. Hanson, coroner of Ford county, testified he knew Hillison forty years. He would talk with acquaintances but with strangers he would only answer questions. He was a bachelor and not inclined to talk with women. Witness last saw him in October before he went to the hospital in Bloomington. There had been no change in his mental condition. Witness regarded him as mentally fit to transact business, able to know what property he had, the value of it, and to understand the effect of making a deed.

Sibert Anderson, a Norwegian who spoke that language, testified he had known Hillison since 1898; that none of his brothers or sisters lived or worked on the farm during that time except John and Hill. John worked on the farm all the time. Hillison talked with the witness about how he intended disposing of his property. He said he thought John ought to have more than the others. Witness last saw him shortly before he went to the hospital. He was in his right mind and able to understand the effect of making a deed of his property and in witness' opinion could not have been influenced to make a deed he did not want to make.

Mrs. Myra Clark testified on behalf of appellees that she was a patient in the hospital at the same time Hillison was. They were on the same floor, across the hall from each other. When the doors were open witness could see the foot of Hillison's bed. She left the hospital October 24. Hillison did not occupy the same room all the time. She remembered a visit of two men and a woman to Hillison but did not know who they were. The doors were open and she heard them talking. One of the men went out and came back with a paper. They all seemed to go up to the bed but she could not see them but heard them moving. The woman said, "We want you to sign this deed, Thom,

for half the land to John." She could not hear any response by Hillison but heard groaning. She did not remember whether Hillison said anything when the parties went to his room. They remained about thirty minutes. Witness did not hear much talking and did not remember the woman talking in a foreign language. The only words spoken that the witness heard was what the woman said to Hillison about signing a deed.

After this suit was begun Julia Halverson married John Hillison. She was offered as witness before the master in behalf of defendant, and complainants objected to her testifying on the ground that she was then the wife of defendant. Neither the master nor the chancellor made any ruling as to her competency. In our view the issue whether Thom Hillison had mental capacity to know and understand what he was doing when he made the deed and the nature and effect of his act does not depend on Julia Hillison's testimony. With some exceptions not controlling in character the facts she stated in her testimony were testified to by other witnesses whose competency is not questioned.

We are of the opinion that, leaving her testimony out of consideration, appellees' proof was not sufficient to sustain the decree. Their proof on the question of Hillison's mental capacity was based upon what the witnesses saw and observed while he was in the hospital. They had never known him previously and knew nothing of his disposition and characteristics. He is shown by the proof to have been a rather rough character, disinclined at any time to talk to anyone and especially to women. While in the hospital he was a very sick man and suffered much pain. It is not surprising that those who saw and attended him there regarded him as stupid and not of sound mind, but the basis or reasons for their opinions are not convincing. From appellant's proof it seems certain he was not, and never was, suspected of being of unsound mind before he went to the hospital at Bloomington, yet the hospital em-

ployees thought him of unsound mind when he entered it. Dr. Donovan and Dwight Day, a neighbor who went with him there and who had known him intimately several years, regarded him as of sound mind then as well as at all times before that, and other acquaintances of many years who saw him shortly before he was taken to the hospital were of opinion his mind was sound; that he knew his property, what he wanted to do with it and was capable of understandingly making a deed. Cameron and Day, who were present when the deed was made, were acquaintances of many years and had no interest apparent that would bias or prejudice their judgment, and it would seem inconceivable that they would have taken the part they did in the transaction of making the deed if Hillison's mental condition had been such as the witnesses for appellees regarded it.

Much stress is laid on the fact that making the deed was not first suggested by Thom Hillison but that Cameron suggested it. John Hillison had worked on the farm ever since he had been old enough to work, without substantial compensation, and his labor contributed to the payment of a $4000 mortgage which his brother gave on the farm when he bought it. There was no agreement or contract that John was to have an interest in the farm, but Thom in the later years of his life recognized that John should have more than he had ever received for his services. The sisters and the insane brother did not contribute any services on the farm, and Thom, from statements he made about his brother John, appeared to have in mind that John should have more of the land than the other heirs and that he intended to make some paper to carry that intention out. Appellee Carrie McAyeal herself recognized the justice of John getting more of the property than the other heirs in a letter to John and the housekeeper, Julia, written November 8, 1917. In that letter she said that Thom did the right thing in giving John so much, as he had been a good, faithful brother to him. Cameron testified he told

Mrs. McAyeal the day before the funeral that Thom had made a deed to John for 80 acres, and she said that was the right thing; that she was satisfied he was entitled to it. The friends and acquaintances of Thom knew he was in the hospital, a very sick man, and Cameron suggested the matter of making John a deed to all or half of the farm. Thom would not deed it all to him but was willing to deed him half of it. The circumstances, we think, do not discredit Cameron's testimony, as he had no personal interest in the matter and would not profit anything whether the deed was made or not. The proof warrants the conclusion that making the deed was carrying into effect a purpose and intention Thom had before he became ill. If he was able when he made the deed to comprehend and remember that purpose and to comprehend and understand his property and the nature and effect of his act in making the deed, the fact that it was first suggested by Cameron could not affect its validity. That he was competent and understood what he was doing is in our opinion sustained by the better and greater weight of the testimony.

Impairment of the faculties by disease or old age will not invalidate a deed if the party executing it had sufficient mental capacity to understand his act. It must be shown that the grantor did not have sufficient mind and memory to comprehend the nature and character of the transaction. Mental weakness that does not amount to inability to comprehend and understand the nature and effect of the transaction is not sufficient to invalidate a deed. The burden was on appellees to prove the allegations of their bill. (*Willemin* v. *Dunn*, 93 Ill. 511; *Kimball* v. *Cuddy*, 117 id. 213; *Sears* v. *Vaughan*, 230 id. 572; *Dalbey* v. *Hayes*, 267 id. 521.) The testimony for appellees is confined to persons connected with the hospital. We do not attach much weight to the testimony of Mrs. Clark. Against their testimony is that of Dr. Donovan, Cameron, Day and Julia Hillison, all of whom saw Hillison at the hospital,—some of them

just before the deed was made or at the time it was made or afterwards. They, as well as the witnesses who testified to his mental soundness before he went to the hospital, were neighbors and acquaintances of many years, and their testimony is at least entitled to as great weight, and in our opinion greater weight, than the testimony of appellees' witnesses. We say this, not because there is anything in the record to indicate the witnesses on one side were more truthful than those on the other, but because there is a better and more convincing basis upon which the testimony of appellant's witnesses rests.

The decree is reversed and set aside in so far as it affects the deed to John Hillison and the cause is remanded, with directions that the further proceedings for partition conform to the views expressed in this opinion.

*Reversed in part and remanded, with directions.*