. EDWARD A. MEYER, Louise E. Erickson, Mary E. Cormier, Clara Steele, W. H. Ramsden, as Guardian of William Edward Ramsden, Helen D. Ramsden, Robert E. Ramsden, Floyd D. Ramsden, Minors, Respondents, v. HORACE G. RUSSELL, Appellant.

(214 N. W. 857.)

**Deeds — mental capacity of grantor.**

1. Impairment of faculties by disease or old age will not invalidate a deed,

---

Annotation.— (4) As to effect of delivery of deed to grantee subject to a future extrinsic condition, see Annotation in 16 L.R.A. (N.S.) 941; 8 R. C. L. 984; 2 R. C. L. Supp. 700; 4 R. C. L. Supp. 585; 5 R. C. L. Supp. 490.

provided, the grantor fully comprehended its meaning and effect, and was able to exercise his will in executing it.

**Statutory provisions.**

2. Under § 5495, Comp. Laws 1913, "A grant takes effect so as to vest the interest intended to be transferred only upon its delivery by the grantor."

**Statutory provisions.**

3. Under § 5496, Comp. Laws 1913, "A grant duly executed is presumed to have been delivered at its date."

**Statutory provisions.**

4. Under § 5497, Comp. Laws 1913, "A grant cannot be delivered to the grantee conditionally. Delivery to him or to his agent as such is necessarily absolute; and the instrument takes effect thereupon, discharged of any condition on which the delivery was made."

**Deeds — evidence shows deed properly delivered.**

5. When a deed is read and thoroughly explained to a grantor who states that she understands the terms of the deed, that she is deeding the majority of her property to her husband; that she and her husband have an understanding that the property is to be deeded to him, and that is what she wants to do, and after the deed is signed, witnessed, and acknowledged she is asked, if the deed is to be delivered to her husband? and she said "Yes," and the deed is then handed to her husband in her presence, who put it in his pocket and pays part of the consideration at the time, there is a good, valid, unconditional delivery of the deed.

**Witnesses — communications to nurse when not "privileged."**

6. Communications to a nurse are not privileged under subdivision 3, § 7923, Comp. Laws 1913, unless they are made when the nurse is acting as the assistant or agent of a physician, and in such case, if the communications are received, or heard from a patient, and are necessary to enable the physician to prescribe or act for the patient, then the privilege extended to the physician applies equally to the nurse, and such communications are privileged.

**Witnesses — general objection to testimony of nurse, not sufficient.**

7. A general objection to the testimony of a nurse is not sufficient, the objection should be made to each question calling for privileged information so that the court can determine whether or not the information was acquired by the nurse while assisting the physician.

**Appeal and error — presumed court considered only competent testimony.**

8. In an action tried to a court, unless it appears otherwise, it is presumed that the court considered only the competent testimony in making its findings and conclusions.

**Evidence — objection to testimony of doctor — no unfavorable inference can be drawn.**

    9. No unfavorable inference can be drawn against a party to an action for objecting to the testimony of a doctor, on the ground that such testimony is privileged, nor for the failure to call the doctor as a witness.

**Deeds — grantor held competent to execute deed in this litigation.**

    10. For reasons stated in the opinion it is *held*, that the plaintiff has failed to establish by a preponderance of the evidence that the grantor in the deed was not mentally competent to execute the deed, at the time it was executed.

Opinion filed May 16, 1926. Rehearing denied August 16, 1927.

Appeal and Error, 4 C. J. § 2726 p. 776 n. 57. Deeds, 18 C. J. § 94 p. 196 n. 17; § 116 p. 211 n. 47; § 131 p. 220 n. 61; § 493 p. 414 n. 2; § 541 p. 438 n. 62; § 551 p. 443 n. 19. Evidence, 22 C. J. § 56 p. 118 n. 96. Witnesses, 40 Cyc. p. 2390 n. 95 New; p. 2395 n. 42; 46 New.

Appeal from the District Court of Cass County, *Englert,* **J.** Reversed.

*Lovell & Horner, McIntyre, Burtness & Robbins,* and *Wood & Breaw,* for appellant.

"The extent of remoteness of time and place concerning which evidence will be received as to the reputation of a party or witness rests largely in the discretion of the trial court, and depends also in a large measure upon the particular facts and circumstances of each case." Ward v. Thompson (Wis.) 131 N. W. 1006.

"An attorney is employed in his professional capacity when he is voluntarily listening to a client's preliminary statement. It is not necessary that any retainer should have been promised, paid, charged or demanded, and it makes no difference though the services are gratuitous." Evans v. State (Okla.) 34 L.R.A.(N.S.) 577, 115 Pac. 809.

"The title of the act may be considered as a means for arriving at the legislative intention." State v. Drakeley, 26 N. D. 87, 143 N. W. 768.

"In a will contest it was not error to sustain objections to questions of physicians whether one in the stages of senile dementia would have the capacity to know the natural objects of his bounty." Re Walsh (Mich.) 163 N. W. 70.

"Understanding the nature of the act means, to invalidate a deed, that the grantor must be incapable of comprehending that the effect of

the act would divest him of the title to the land as set forth in the deed." Miller v. Folsom (Okla.) 149 Pac. 1185.

"A grantor who has mental capacity sufficient to understand ordinary business transactions at the time of the factum and understands the motive and effect of the deed which he makes, knows what property he is conveying and to whom it is being conveyed, is competent to make such deed." Kelly v. Perrault (Idaho) 48 Pac. 45.

The burden of establishing the mental incompetency or incapacity to execute a deed is upon the parties alleging the same. Nelson v. Thompson, 16 N. D. 295; Cogland v. Church (Iowa) 203 N. W. 812.

*Shure & Murphy,* for respondents.

In the absence of statutory provisions the death certificate of physician or a health record alleged to be based thereon is incompetent being hearsay and because of their privileged character. Pence v. Meyers (Ind.) 101 N. E. 717.

"The hypothetical question may include any state of facts which the evidence tends to prove." 11 R. C. L. 579, § 11.

Delivery is a question of intention, it is not necessary that there be any manual transfer of the instrument in question." McGrath v. Hyde (Cal.) 21 Pac. 948; Whitney v. American Ins. Co. 59 Pac. 897.

"What constitutes a sufficient delivery of a deed is largely a matter of intention, and the usual test is, did the grantor by his acts or words, or both, manifest an intention to make the instrument his deed and thereby divest himself of title." Kelsa v. Graves (Kan.) 68 Pac. 607.

"Whether a delivery is so far completed as to pass the title is a question of fact, depending largely upon the intent of the grantor to vest the estate in the grantee." Chastek v. Suba (Minn.) 101 N. W. 618.

"It is a general rule supported by unanimous weight of authority that the constitutionality of a statute cannot be first questioned on appeal in a civil action." 3 C. J. 710, § 608; 6 R. C. L. 95, § 96.

BURKE, J.: This is an action to set aside and cancel a deed executed by Clara B. Schmidt-Russell, to Horace G. Russell her husband, on the 20th day of November, 1922, to certain property in the city of Fargo, N. D. of the approximate value of $100,000.

The plaintiff, Edward A. Meyer, is Mrs. Russell's brother of half blood, and the other plaintiffs are sisters of half blood.

The complaint alleges that Clara B. Schmidt was mentally incompetent at the time of the execution of said deed, and that the same was procured by fraud and undue influence; that the deed was never delivered, and if delivered, was not to take effect until after the death of the grantor. The defendants deny each allegation, of fraud, undue influence and incompetency, and specifically alleges, that the deceased was mentally competent, the deed executed freely and voluntarily and delivered to the grantee.

The trial court at the close of the testimony, decided each allegation in favor of the plaintiffs, and thereafter made findings of fact in effect that Clara B. Schmidt-Russell was mentally incompetent to execute the deed at the time of its execution, and as a conclusion of law, that the deed was void, upon which judgment was entered cancelling and setting aside said deed. Defendant appeals to this court for a trial de novo.

There are specified thirty errors of law in the admission of testimony, and that the evidence is insufficient to support the findings of fact and conclusions of law.

The instrument assailed, on its face is a warranty deed. Clara B. Schmidt-Russell signed the deed by her mark in the presence of two witnesses, and acknowledges the signing of the same before a notary public. The evidence shows that some time before the 22nd day of November, the defendant asked attorney Wood to draw a deed in which Clara B. Schmidt-Russell would be named as grantor, and the defendant, Horace Russell, as grantee, and by the terms of which Clara Russell would grant and convey to the defendant, certain property in the city of Fargo, N. D. The description of said property was taken from the tax receipts and included in the deed executed on the 22nd day of November 1922. On that day attorney Wood, accompanied by his stenographer who was a notary public, went to the home of the grantor and grantee in said deed, to have the deed executed. The witness, Charles H. Graham, who was conducting a grocery store not far from the home of the defendant, one Henry E. Tietgan at the request of the defendant were present at the time of the execution of the deed, and signed the same as witnesses.

The testimony of the defendant, attorney Wood, Charles H. Graham, and Lucile Higgins is, in substance, that when the parties were all present, Mr. Russell and the nurse, Mrs. McKinnon, lifted Mrs.

Russell up, placed pillows behind her, and Mr. Wood told Mrs. Russell that he had a deed for her to execute. He read the formal parts and when he came to the first description after reading, Mrs. Russell said, "That was the Palace," and when he finished reading each description, he asked Mrs. Russell if she understood and knew the property which she was conveying to her husband, and she would reply that she did. As Mr. Wood completed the reading of descriptions, he gave her the street number and location of the property, and asked her if she understood and knew the property, and in each instance she did. After reading the deed Mr. Wood said to Mrs. Russell, "You are by this deed conveying the majority of your property to your husband, is that what you want to do?" She said, "Yes, papa and I have talked it all over, and we have a complete understanding and that is what I want to do." Then the deed was presented for her signature, a magazine was placed on her lap, Mr. Russell brought the pen and ink, and placed the pen in her right hand, took hold of her hand in his, and the signature was made in that manner. Mr. Wood said, "I requested her to make a mark owing to the fact that her hand was guided by Mr. Russell," and the mark was made. Mr. Wood took the deed, handed it to Mr. Graham who signed the same, as a witness, and it was then signed by Mr. Tietgen. It was then handed to Lucille Higgins, who asked Mrs. Russell if she had signed the deed, and whether that was her signature, Mrs. Russell replied, that she had, and Mr. Wood said, "You have signed this, Mrs. Russell, under your own free will and accord?" And Mrs. Russell said she had. Mr. Wood then took the deed and asked Mrs. Russell if she wished him to deliver the deed to Mr. Russell and Mrs. Russell said that she did. Wood then delivered the deed to Mr. Russell who paid to Mrs. Russell $10 in new one dollar bills, the money was laid in Mrs. Russell's hands, and she drew them up to her breast, smiled, and said, she didn't think she would have very much use for that money. The testimony of all the witnesses present shows that the deed was executed in the foregoing manner and was delivered to the defendant at Mrs. Russell's request.

The nurse, Mrs. McKinnon, states, that she was not present at the time the deed was executed, that Mr. Russell told her that she might leave early that afternoon, as he was going to have some people in, on some business transaction. This is denied by Mr. Russell and all the

witnesses who were present when the deed was executed testify that Mrs. McKinnon was present and that she helped to prop Mrs. Russell up in bed so she could be in a sitting position when she signed the instrument.

It is clear from this testimony that the instrument is not a will but a deed executed freely and voluntarily. It is also clear that it was delivered to the defendant. To hold otherwise would be in the face of the positive testimony of disinterested witnesses.

In further support of the deed the defendant claims, and the evidence shows that he married Mrs. Russell on the 23rd day of Oct. 1906, and they lived continuously together as man and wife up until the time of her death in October, 1923. At the time of their marriage Mrs. Russell had property valued at thirty or thirty-five thousand dollars. The defendant was a paper hanger, painter and something of a carpenter. He became interested in Mrs. Russell's property, he looked after it, kept it up in good order by painting, papering, kalsomining and doing anything and everything to make the property attractive and salable, and in addition to all of this he learned values. As said by the trial judge in his opinion, "It is admitted on the witness stand (that the defendant) had wide business experience and business ability, whether it had been acquired since he married Mrs. Russell or not, makes no difference, his own testimony is to the effect that he drove some very strong, fine bargains, and therefore he must be credited with having a good deal of business perception and conception." The manner in which he handled Mrs. Russell's property apparently made a deep impression upon the trial court, as it has upon this court. Some of the property at the time of their marriage had mortgages against it, which were paid off, new buildings were put up, property sold and property bought. Both Mr. and Mrs. Russell became deeply interested in the accumulation of property. They quarreled about it, they called each other names; but their quarrels and bickerings never for an instant stopped the vigilance or the industry of each in the looking after the accumulation of property.

Mrs. Russell's first husband conducted a saloon in Moorhead, for many years, and it appears that Mrs. Russell tended bar in the saloon, and it was there that she first met Mr. Russell. She and her first

husband had accumulated the property which she had at the time of her marriage with the defendant.

At the time of her marriage to the defendant, she was 53 years of age, and he was 45. Mrs. Schmidt and her husband during Mr. Schmidt's lifetime accumulated property not to exceed $35,000. Mrs. Schmidt-Russell and Mr. Russell in seventeen years accumulated approximately $165,000.

It is a matter of common knowledge that papering, painting and decorating and the keeping of property neat, fresh, and attractive makes it salable, and in a large measure the activity of the defendant is responsible for the growth and increase in the value of the property. Besides it appears that during the time Mrs. Russell lost a considerable amount in a law suit.

As against the validity of the deed there is the testimony of Mary Cormier, Louise Erickson, Mrs. McKinnon, Henry Ramsden, Laura Bliss, and W. H. Shure, and the testimony of expert witnesses Dr. Burton, Dr. Nichols, and Dr. Aylen, in answer to a hypothetical question. The question is based partly on a death certificate made by Dr. Burton, the physician who attended Mrs. Russell at the time of her death. This death certificate states that he attended her from May, 1920, until October, 1923, that the cause of death was arteriosclerosis of five years duration, the contributory cause of death being cerebrospinal syphilis of fifteen years duration. The doctor who made this certificate, testified that he was called in 1920, to treat Mrs. Russell. The certificate of death is not sworn to, there was no opportunity to cross-examine, and since the doctor was not called until May, 1920, his statement in the death certificate in relation to the cause of death is not founded upon actual knowledge, and must be either hearsay or an estimate. The admission of the death certificate is assigned as error, and it is the contention of the appellant that the purpose of the certificate is in aid of "Vital Statistics" and that if the legislature intended it as evidence in cases between parties, the title of the "Vital Statistics Act" is not broad enough to permit it to be used for such purpose and that part of the act permitting it to be used in evidence is unconstitutional.

It is our opinion, that this case can be decided without passing on the constitutional question. Dr. Burton who made the death certificate

testified, that he attended the deceased from May, 1920, to October, 1923. He makes the statement in the certificate, and he answers the question therein, "Where was the disease contracted?" Ans. "Not known." "That the cause of death was arteriosclerosis of five years' duration, the contributory cause of death being cerebro-spinal syphilis of fifteen years' duration." It appears in the certificate itself that the first knowledge Dr. Burton had was in May, 1920, and his statements in the certificate, that the cause of death was of five years' duration and the contributory cause was of fifteen years' duration are necessarily hearsay, or an estimate. The statements in the certificate are included in the hypothetical question propounded by the plaintiff to Dr. Burton and others, and in answer to which they testified that Mrs. Russell was not competent to make the deed on the date of its execution. It is also claimed by the appellant that the inclusion in the hypothetical question of the statement of nurse McKinnon, viz.: "That Mrs. Russell had a paralytic stroke on the 10th of October, 1922," was error. Nurse McKinnon was not a graduate nurse and she is the only witness who testified that Mrs. Russell had a stroke on October 10th, 1922.

Dr. Sweeney of St. Paul, a specialist in nervous and mental diseases, who has devoted himself for about thirty-five years to his specialty, and who has been for twenty-seven years professor of medical jurisprudence in the University of Minnesota, was asked the same hypothetical question by appellant, and states, "that the recital of facts in the hypothetical question is not inconsistent with a sound mental condition, because, all the facts therein narrated relate to physical condition rather than to mental." He is corroborated by Dr. Hotchkiss of Fargo, who is a specialist in nervous and mental diseases, and was for a number of years superintendent of the State Hospital for the Insane at Jamestown, N. D., and also by Dr. William Hengstler of St. Paul, a specialist in nervous and mental diseases, and an instructor in the medical school of the State University of Minnesota.

Upon the subject of the expert testimony, the trial court said: "I have listened attentively to the expert testimony in this case but I have not thought that it was of any great value or help to the court."

Counsel for respondent practically abandons the testimony of the experts. On page 59 of respondent's brief there appears the following, "We think it fair to assume from the statement made by the trial

court, that the views of the experts did not weigh very heavily in his decision." Then follows a quotation from the opinion of the trial judge, in which he states that he "thought the expert testimony was not of any great value or help to the court."

We agree with the statement of the trial court as expressed in his memorandum opinion, viz.: "I have listened attentively to the expert testimony in this case, but I have not thought that it was of any great value or help to the court," and we are further of the opinion that it does not tend in any substantial degree to establish the incompetency of Mrs. Russell to execute the deed.

Assignments of error 1, 2, 3, 4, and 5 relate to the testimony of the defendant when called for cross-examination by the plaintiff, concerning the value of Mrs. Russell's property, the relations between Mrs. Russell and the defendant, and question as to whether he had a certain disease. This testimony is somewhat remote, but according to our view was not prejudical.

Assignments 6, 14, 15 relate to the evidence of witnesses about the domestic relations of Mr. and Mrs. Russell commencing back in 1906 and continuing until May 31, 1922. Appellant concedes that the defendant and Mrs. Russell quarreled over the property called each other names, and therefore, this testimony is only proof of what is conceded by the defendant. However, a great deal of this testimony relates to statements claimed to have been made by Mrs. Russell, not in the presence of Mr. Russell, to the witnesses, admitted in evidence by the court under the objection that it was hearsay. Such statements are found in the testimony of Mrs. McKinnon, Mrs. McJannet, James McGuigan, Mrs. Hildreth and others. It is the contention of the respondent that such testimony is admissible for the purpose of showing the domestic relations of the defendant and Mrs. Russell. That a part of the consideration in the deed is love and affection, and therefore, it was competent to admit the statements made by Mrs. Russell to the witnesses to prove that there was no love or affection existing between them. The trial court adopted this view and admitted the statements. This testimony relates to conversations with Mrs. Russell prior to the 31st of May, 1922, most of it many years before that date, and in the light of the undisputed testimony establishing their friendly and affectionate relations after that date, and until the date of Mrs. Russell's death in

October, 1923, it is so remote as to afford little, if any support for the contention of the plaintiff that there was no love and affection existing between the Russells when the deed was executed.

In his memorandum opinion the trial court said: "There is but one man ·in this case, from a medical standpoint, that I could consider to any extent, and that is Dr. Burton; although his evidence was excluded to a very large extent, I would have liked to have had it. No one would rather have it than I, but the rules of evidence, statutes, rules of law, are such, that those are matters of privilege, and, hence, this court cannot for the sake of this instance, hold that the gates shall be opened, and then, in the next instance, hold that it shall be closed. . . . And consequently, much as I would have liked his testimony, I felt in duty bound to exclude it, and I did, with some exceptions. There are some exceptions, here, and, naturally, I felt that Doctor Burton, having this woman under his care, constant observation; having been her attending physician over a long period of time, knew more than any one else what her physical and mental condition was." It is apparent from this statement that the trial court was impressed with the absence of Dr. Burton's testimony, and while he recognized that his evidence could not be had on account of the privilege, the fact that his superior knowledge was not available did have weight with the court in arriving at a decision. But no inference can be drawn against the defendant for objecting to Dr. Burton's testimony on the ground of privilege or for failing to call Dr. Burton as a witness.

The rule is stated in 10 Encyclopedia of Evidence, p. 163, as follows: "It is error for the trial court to permit counsel to argue that refusal to waive privilege should be taken as an admission that the physician's testimony would be unfavorable." Brackney v. Fogle, 156 Ind. 535, 60 N. E. 303; State v. Booth, — Iowa, —, 88 N. W. 344. "No unfavorable inference can be drawn from patient's failure to call physician as witness." Arnold v. Maryville, 110 Mo. App. 254, 85 S. W. 107. The court says: "In Wentworth v. Lloyd, 10 H. L. Cas. 589, 11 Eng. Reprint, 1154. It must be clear that if an unfavorable presumption against one should be allowed when he refused to waive his privilege, or failed to call the physician as a witness, the privilege itself would be destroyed, and the policy of the statute thwarted." Storrs v. Scougale, 48 Mich. 387, 12 N. W. 502.

Volume 4, Jones on Evidence, § 761, p. 570: "No unfavorable *inference* should be drawn *from claiming the privilege.* To hold that, because the patient does not waive or abandon the prohibition, inferences adverse to his side of the controversy may be drawn by the jury, would be to fritter away the protection it was intended to afford."

Assignments 7, 8, 9 and 10 relate to the testimony of the nurse, Mrs. McKinnon, Miss Bliss, Mrs. Merganthal, and it is the contention of the appellant that these nurses were acting directly under the attending physician, and the relationship is the same, as that of the assistant, clerk or stenographer in a law office, and the testimony which they gave was therefore privileged and inadmissible.

Subdivision 3, § 7923, Comp. Laws 1913 provides:

"A physician or surgeon cannot, without the consent of his patient, be examined as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient."

The privilege being statutory it must come within the terms of the statute, which specifies physicians and surgeons, and has been held to include necessary intermediaries whose intervention was necessary to enable physicians to obtain information essential to the performance of his duty, such as an assistant nurse or agent of the physician or surgeon. The subject is discussed at length by the Nebraska court in the recent case of Culver v. Union P. R. Co. 112 Neb. 441, 199 N. W. 794, and from which we quote as follows:

"It is assigned that prejudicial error was committed by the court when it sustained objections to the testimony of Miss Clara Rhodes as being a privileged communication. Miss Rhodes was superintendent of nurses at Dr. Fall's hospital at the time plaintiff was taken there. Preliminary inquiries were made as to the facts surrounding her duties in the hospital. Defendant offered to prove by his witness that she was present when a specimen of blood was taken from the plaintiff by Dr. Fall; that she sent this to the state laboratory at Lincoln, Nebraska; together with a blank requesting a Wasserman test to be made of the blood, to which the name of Dr. Fall was signed, and that a few days after the specimen was mailed a report was received from the laboratory, directed to Dr. Fall, showing the result of the Wasserman test. Defendant also offered to prove that the witness administered to the plaintiff at various times while he was at the hospital.

At the time the Nebraska statute was enacted the profession of graduate or registered nurse had scarcely come into being. Observing that the same reasons which caused the extension of the privilege to physicians applied with equal force to the professional nurses, New York and Arkansas have amended their statutes so as to include, "a professional or registered nurse." But the legislature of Nebraska has not included such persons within the privilege class, and a nurse, merely as such, is not within such class. Homnyack v. Prudential Ins. Co. 194 N. Y. 456, 87 N. E. 769.

"A different rule prevails where the nurse acts as one of the agents or assistants of the physician in charge. A nurse is often necessarily present at conversations between the patient and the doctor with respect to the ailment or condition of a patient, and little good would be subserved if the lips of the doctors might be sealed by the statute as to such conversations but the nurse or attendant might freely testify to all that was said and everything that was done. The purpose of the law is to protect the right of privacy, and while its scope should not be unduly extended, its very intention might be completely thwarted by the admission of testimony from this class of witnesses. In such case, if she received or heard confidential communications from a patient 'necessary and proper to enable him (the physician) to discharge the functions of his office according to the usual course of practice,' then the privilege extended to the physician extends equally to the nurse. 15 Wigmore, Ev. 2d ed. §§ 2321, 2380–2383. There was no error in this ruling."

In the case of Springer v. Byram, 137 Ind. 15, 22 L.R.A. 224, 45 Am. St. Rep. 159, 36 N. E. 361, the Indiana court said: "The objection to the offered testimony was sustained upon the theory that it was incompetent to prove a conversation between a physician and his patient. It had been held that communications made through a third person from a client to a solicitor are privileged, if otherwise entitled to be so; also, whoever represents a lawyer in conference or correspondence with the client is under the same protection as the lawyer himself. The privilege extends to the attorney's clerk, interpreter, assistant attorney, or other agent, while in the discharge of his duty. At common law, confidential communications made by a patient to a physician are not privileged. The common law in this state had been changed by

statute, supra. It was said in Masonic Mut. Ben. Asso. v. Beck, 77 Ind. 203, 40 Am. Rep. 295, that the object of these statutes seems to be to place the communications made to physicians in the course of their professional employment upon the same footing with communications made by clients to their attorneys in the course of their employment. The privilege may attach notwithstanding the presence of third persons in the' sickroom, where the consultation is had. Cahen v. Continental Ins. Co. 9 Jones & S. 296."

Section 2301, vol. 5, Wigmore, Ev. 2d ed.:

"It has never been questioned that the privilege protects communications to the attorney's clerks and his other agents for rendering his services. The assistance of these agents being indispensable to his work, and the communications of the client being often necessarily committed them by the attorney or by the client himself, the privilege must include all the persons who act as the attorney's agents."

The foundation for the objection was laid as follows: "Nurse McKinnon testified, A. That was not until October, up to about October the 18th—Doctor Burton said that she had better be—we should not let her get up any more, because he noticed that her pulse was not normal, and her breathing was rather difficult, and he thought he better put her on a buttermilk diet, and she was on the buttermilk diet for several months."

Mr. Lovell: "Let me ask a question, for the purpose of laying a foundation." Q. "What do you mean when you say 'we' did?" "Whom do your mean?" A. "Doctor Burton and I." Q. "Doctor Burton and you?" A. "Yes, sir." Q. "Were you acting under the advice and orders of Doctor Burton?" A. "Absolutely." Q. "Yes; and you were the nurse that was employed in connection with his service as a physician?" A. "Yes. Mr. Lovell:" Q. "You said you were acting under advice of Doctor Burton?" A. "Yes." Q. "And he was in charge of this woman at that time?" A. "Yes." Q. "And you were the nurse employed in connection with such services as a doctor?" A. "Yes." Q. "That is true all the time you were there from July 31, until the time Mrs. Russell died, is it not, as far as you are concerned?" A. "No, sir." Q. "Doctor Burton discharged you?" A. "Not Doctor Burton, Mr. Russell." Q. "Didn't Doctor Burton tell you to go?" A. "Doctor Burton never told me to." Q. "You were

acting as nurse under Doctor Burton, and subject to his order all the time?" A. "Yes." Q. "And the information you got in regard to the facts in regard to her condition was information you obtained through Doctor Burton?" Ans. "Yes."

Miss Merganthal testified, "Dr. Burton was in charge when I was there and I operated as a nurse under his instructions."

Miss Bliss testified, "Was there from the 14th of April 1923, until the 20th of September, 1923. I was called at the hospital; she was at the hospital for a few days. Dr. Burton was the physician and I was acting under his orders and instructions."

Mr. Lovell: "Counsel for the defendant now objects to the introduction of any further testimony on the part of this nurse, upon the ground that the information which she obtained there at the time she was employed there under Doctor Burton was privileged information, such as was communicated by Doctor Burton in connection with his professional work as a physician, in his attendance upon Mrs. Russell; that the information obtained by this nurse, as shown by her testimony, was obtained through Doctor Burton, as the physician under whose orders she was working; and counsel objects to any further testimony of this witness, relating to information obtained while she was so employed as nurse for Doctor Burton between July 31, 1922, and the time, August 13, 1923, as privileged information, and as subject to the rules of information which is privileged."

The same objection was made to each witness, it was agreed that the testimony might be taken subject to the objection, and the decision reserved until the close of the case. The objection includes all information of the witness, acquired while attending Mrs. Russell as a nurse. Not all information which a nurse may acquire is privileged, but only such information as is necessarily imparted to the nurse as an assistant of the physician in administering to the patient, and which is necessary to enable the physician to prescribe. The objection should be made to each question calling for privileged information so that the court can determine whether or not the information was acquired by the nurse while assisting the physician. The burden of establishing the privilege was not met by the general objection, and the trial court, many times during the trial, stated that the nurses in testifying could not give conclusions, nor tell what the doctor said, that they could only tell

what they saw themselves, and it is presumed, unless it is otherwise, that the trial court considered only the competent testimony in making its findings and conclusions.

In April 1923, Mrs. Russell was taken to the hospital and Miss Bliss, a trained nurse, was employed from the 14th of April to the 29th of September. Miss Bliss states that Mrs. Russell was not competent to execute a deed while she was attending her, but that she did execute a deed which was witnessed by Miss Bliss herself, that her mind part of the time was a blank, that she could not carry on a connected conversation, she could not feed herself, without assistance, she got better for a while, and then she got worse again, her body was yellow in color and at times it broke out. Miss Bliss was the day nurse, and Mrs. McKinnon the night nurse during the time that Miss Bliss was there. She could not carry on a conversation for any length of time, a part of the time she wasn't rational. I was sure that her mind was blank part of the time. No callers were allowed, she had no callers there, no callers talked to her at all. Yes it is a fact, that she was wheeled on the porch. I was on from eight in the morning until eight at night." On cross-examination she says, "that acquaintances did not stop and talk to Mrs. Russell" and she is asked, "if Con Keefe did not stop and converse with her, and she admits that he did, and that she remembered Keller, the plumber, talked with her on the porch, I do not remember what he said, I cannot recollect—I don't remember Mrs. Morgan. We couldn't tell the callers not to look at the patient, you don't feel like driving anyone away. Yes they did stop and talk to her, as far as her callers and company was concerned I wasn't entertaining any one there. I did not talk to Mr. Shure about any testimony. I did not talk to Mr. Murphy about it, nor to Mrs. McKinnon; I have not talked to anyone about the testimony." Q. "Ever talk to any one about the testimony you should give in this case?" A. "No I haven't positively."

Miss Blass was employed six months after the deed was executed, and Mrs. Russell's condition was much worse at that time, as shown by the employment of an extra nurse, only one nurse having been employed before. This testimony is very remote, full of contradictions, and the hostility of the witness as shown by her curt, if not impudent, answers in contradicting her former testimony "that no visitors were allowed," "that no one stopped to talk with Mrs. Russell when she was on the

porch," "that she was not there to entertain anyone," together with her positive statement that she talked with no one about what her testimony would be at the trial, makes an unfavorable impression on the court. It is a matter of common knowledge consistent with good practice, that every skilful trial lawyer before he puts a witness on the stand learns from some source, what the witness knows about the facts either by talking to the witness, or by having someone talk to the witness, so that he may know, if the testimony is competent, relevant and material. Her contradictions and her positive denial of having talked with any-one about the testimony she was to give, makes her entire testimony extremely doubtful and of very little value.

Nurse Merganthal was called to nurse Mrs. Russell after the paralytic stroke in the bank on May 31, 1922, she states: "I did not think her mental condition was fit to transact business while I was there, because she was very forgetful and things she would speak of at one time she would forget or speak of them later and have them all tangled up with something else." On cross-examination she says, "She did get some better while I was there; she was pale, afterwards com-plexion became normal." She was asked if Mrs. Russell understood, she says, "Well, not to begin with, well we did not know whether she did or not, but later on we knew she did understand, she replied to questions when she was asked, she answered intelligently. At first we had her on a light diet, or rather a liquid, and later after she improved we put her on a general diet. I knew Mrs. Russell's sister, Mrs. Cormier, she was there while I was there, I heard her talking occasion-ally to Mrs. Russell. I never was in the room when they had conversa-tions, but they were talking together, I heard them. I knew Mrs. Erickson, another half sister of Mrs. Russell, and I remember her talk-ing to Mrs. Russell, and I heard Mr. Russell talking frequently to his wife. I saw Mr. Ramsden there, he wasn't there very often while I was there, I met him there only twice, he talked to Mrs. Russell, I did not listen to the conversation—I heard him speak and I heard her speak. I think I came about three or four days after Mrs. Russell left the hospital after her stroke on May the 31st. Mrs. McKinnon suc-ceeded me. At the time I left Mrs. Russell had improved in general health, and her condition was far better than when I went there. Mr. Russell seemed to be kind and attentive to Mrs. Russell." From this

testimony it would appear that Miss Merganthal was employed about the third or fourth of June and remained until the 31st of July, when she was succeeded by Mrs. McKinnon. A part of the time Mrs. Russell was quite sick, but she continued to get better and was in far better health at the time when Miss Merganthal left. This is corroborated by practically all the witnesses and the evidence.

There is Mrs. Cormier's letter to Mrs. Russell, stating how joyful they were to learn that she is recovering and inviting her to visit them in Montana. Certainly nurse Merganthal's testimony is no evidence that Mrs. Russell was not competent to execute the deed in controversy on the 20th of November, 1922.

Attorney Shure testified that, "between the 15th and the 20th of June 1922, Mr. Russell came to the office and employed him to draw a will for Mrs. Russell." "I accepted the employment." "I had a conversation with Mrs. Russell, I asked her if she sent for me, she said she did not, I asked her if she knew who I was, she said, oh yes, she volunteered the statement that she knew me, I asked her if she wanted to make a will, she said she did not, I told her it would be a good idea for her to make a will, and I was there at Mr. Russell's request for the purpose of drawing up a will, which I understood from him that she wanted to make and she said she hadn't thought much about it." The witness continues at length to detail the conversation that he had with her about her property, and about its disposition. He states, "When I first started to talk to her I thought she was perfectly rational and capable of executing a paper of that character. Mr. Russell was there part of the time when I first went in the room, but he left and went to the kitchen." The conversation lasted for more than a half hour, when witness concluded that she was not competent to make a will.

The testimony was all objected to, on the ground that the same was privileged under the statute. We do not regard this testimony as important. Shure placed the day between the 15th and the 20th of June, and thinks it was on the 17th. At that time Mrs. Russell was very sick. It was on the 17th of June, that the defendant met Dr. Burton in the Savings & Loan Bank, and was told by Dr. Burton, that his wife wanted to make a will, and that Mr. Loomis and Dr. Burton advised him to get Shure to draw the will. (Counsel for the plaintiff claims, that Dr. Burton denied the conversation in the bank, but counsel is mis-

taken, Dr. Burton testified, that he did not remember telling Mrs. Farrar that Mrs. Russell was very sick and ought to make a will, but he does not deny the conversation in the bank with Russell.)    Dr. Burton must have known that Mrs. Russell was very sick at that time, and he must have thought that she was competent to make a will when he broached the subject to Mr. Russell and advised him to get Mr. Shure to draw it.

It was about that time Mrs. Russell had the sinking spell, and Mr. Russell asked his daughter, Mrs. Farrar, to write to the sisters of half blood, and to let them know that Mrs. Russell was seriously sick.    The letter was mailed on the 21st of June, 1922, and the testimony shows that after that date she commenced to get better and continued to improve up to the time the deed was executed, according to all the evidence, except that of Mrs. McKinnon.

After Mrs. Cormier returned to Montana she received a letter from Helen Ramsden and one from Henry Ramsden, on receipt of which she wrote Mrs. Russell as follows:

Missoula, Mont.
Sept. 7, 1922.

Dear Sister Clara:

We are all so glad to hear you are now able to sit up and hope and trust you are entirely well by this time.    We arrived home all right and I certainly was glad to get home for I was very much afraid of the railroad strike taking place but we have been home now about six weeks and no strike as yet but still it is unsettled.    I would of written to you before but I thought I would wait until you got better so you could receive my letter and read it yourself and able to write to me yourself in German as I know you never write letters in English so as soon as you are able to write be sure and write me a long letter as I am anxious to hear from you.    I just wish we could of stayed there in Fargo and have a nice visit when you got better and the children too wanted to stay and see you get better for they certainly love their Aunt Clara dearly for when Anita got a letter from Helen Ramsden saying you were able to sit up she danced all over with joy.    Now dear sister Clara when you get better well and strong we all wish you would make us a visit for a while for I am sure the change would do you a world

of good and we will be so glad to have you and we would make it as pleasant and as comfortable for you as can be. I am sure you would enjoy a visit with us very much. The weather here is just fine days warm and nights cool but still one can see that fall is coming on. Well dear sister I heard from Sister Louise once since I came home and she says she may come and make us a visit around Xmas. We stopped off at Billings, Mont. with her daughter Marie and I guess she has a very fine husband for he is certainly good to her and she is very happy. Well dear sister I don't know of any more to write today so will close for this time with our best love and wishes for you all and many kisses from the children, Anita and Louise and we all wish for you to get your health and strength back soon. I remain always your loving sister. Ans. Soon.

Mary Cormier,

Address                                       718 S. First St.

Missoula, Mont.

The testimony of the defendant, and nurse Merganthal in relation to improvement in Mrs. Russell's health in June and July 1922, is corroborated by the foregoing letter. When this letter was presented to Mrs. Cormier at the trial she states, she got the information of the improvement in Mrs. Russell's health in a letter from Helen Ramsden, daughter of Henry Ramsden, who thought at that time that they were heirs to Mrs. Russell's property, and she also got a letter from Henry Ramsden. Henry Ramsden and Helen Ramsden could have had no reason for writing Mrs. Cormier about the improvement in Mrs. Russell's health if there was no improvement.

Mrs. McKinnon, a nurse, but not a graduate nurse, testified that she first met Mrs. Russell in 1912 at her home. She roomed there from 1912 to 1918. On July 31st, she was hired to nurse Mrs. Russell, and was there until August 13, 1923. From April until August 13, 1923, she was on night duty, and a Miss Bliss on day duty. Mrs. McKinnon testified that Mrs. Russell was confined to her bed a couple of months after July 31, 1922, because she had a very bad heart attack about that time. After a little while they would raise her up in bed, or help her to a chair; Mr. Russell would occasionally assist. She couldn't stand alone. The witness would place chairs which the patient would

use as a crutch to support herself. She went back and forth from her bed to her wheel chair in this manner until about October 18th. "We had her up every day, sometimes every other day, for a month or two, I think. That was in August, up until some time in August, until the month of September. We had to feed her, sometimes, Mr. Russell fed her. She stammered a little and her articulation was not quite clear. I was there mostly all the time, she would start to tell you something, and would seem to forget it, and branch upon some other subject. That continued in August and September. Her left hand was quite helpless and her right leg. Both legs seemed to be a little helpless, they both dragged a little. Her left arm was quite helpless up until October the 10th. Defendant was home at that time and he said one day that he wondered if she would be clear in her mind again, that, if her mind would clear up, it would complicate things for him, because it would take the power of attending to her business from him. . . . About the first of October she had a paralytic stroke. (Striken out.) I know this, on the morning of the 10th, that she was almost, well, she was subconscious, she didn't speak, and her body seemed a little pale, and she didn't want to talk, and she didn't ask for anything. She slept most of the morning through and I thought her condition didn't look just normal to me and I called Doctor Burton up, and he came out later on. She had a paralytic stroke, after that her arms and legs were more helpless. From that time on she didn't observe things as she had before. She didn't seem to notice when people would make a noise around the door and she wandered in her mind. She would ask about the people upstairs. (There was no upstairs.) She said that parcels had been delivered. One day she told the witness that Mr. Russell had died. Her mental condition after October 10th was 'absolutely worse.' " Continued as long as the witness was there, and she failed gradually physically. "Never saw her out of bed save in a wheel chair when her head was lowered and feet were up." During that period defendant asked the witness if it would be all right for Mrs. Russell to sign some papers, and witness told him she wasn't physically or mentally capable of doing it. "I told Mr. Russell it would not be fair or just to ask her to sign any papers, because she couldn't stand the strain, and besides her mind wasn't clear, and he thought it was better not to have her sign any papers. That was after October 10th. . . ." Question.

"Was it before the 20th of November?" Ans. "Possibly—I can't say definitely." Ques. "Would you say it was shortly after October 10th?" Ans. "Yes. . . . I saw her body quite a number of times. She had an eruption all over her body. Several sores. They were not bed sores. Mrs. Russell was not on the 20th of November, 1922, of sufficient mind and understanding to transact business such as making out and giving a warranty deed to valuable property. Her mental condition failed from October 10th." On a certain day, witness did not remember if it was the 20th of November, Russell asked her what time she was going out in the afternoon and suggested that she go a little earlier because he expected some man in to talk over some business matters. She left about one o'clock and when she came back asked if everything went all right, and he said, " 'Yes, they had been there and everything was to his satisfaction,' but he didn't tell me anything about this deed or anything like that." "Immediately after the funeral Russell talked with me about the deed. We went to the home that Mrs. Russell died in. . . . His daughter, Mrs. Farrar was with him and Mrs. Hopke also. He asked me if I hadn't been there when the deed was signed. I told him I wasn't, I had been attending to her at the time but I wasn't there at the time that that deed was signed. He said, 'You will have to learn your lesson better than that.' I told him 'Mr. Russell, I am going to tell the truth and nothing else.' " On cross-examination the witness testified: "Mrs. Russell was very bright. She was refined. Sometimes used language that was a little strong. She was very liable to call her husband 'a son of a bitch.' " Used rough language to Russell in her business dealings. They quarreled and had very strong words. Once he called her a damn ninny, witness was hostile to the defendant some of the time. Defendant told her she would be remembered in Mrs. Russell's will, and there was no will. Before the witness had attended Mrs. Russell, the latter had told the witness that she would leave her something, but the witness paid no attention to it. Her mental condition was almost shattered after the 10th of October 1922. Witness fixes the date at October 10th by the ordering of nightgowns by telephoning from the house of a neighbor, and she subsequently went down and got the dates from the store. She called Dr. Burton. He was there once that day and came the next morning. "On that date (October 10th) I ordered two nightgowns and

two yards of green cloth—that is the reason I know it was the exact date." Ques. "Is that the only date you got nightgowns or green cloth for her ?" Ans. "No, I didn't order that—I went—I didn't get the same, I got four that once." Ques. "Four ?" Ans. "And they brought it." "There was only two and four yards of cloth." "Mr. Loomis called to get a withdrawal receipt from Mrs. Russell some time in September, I think. I don't think it was later than that." Ques. "You would not be positive as to that date, would you ?" Ans. "Oh, I am perfectly sure that it was before October 10th, absolutely sure." Ques. "Now if there is testimony that it was on October 23, 1922, that Mr. Loomis came to get this withdrawal receipt, you would not be in position to deny it, would you ?" Ans. "October 23d." Ques. "Yes, ma'am." Ans. "Yes, I would . . . He was there before October 10th. The reason I can fix the time is this way, that Mr. Russell spoke to me about her having to sign that paper. I thought that she was physically fit and mentally, in a way, to sign a little paper like that. I didn't know the amount. I heard Mr. Loomis ask if she was willing to have this money transferred so Mr. Russell could pay the income tax." "Didn't hear her answer because she wasn't in there. The reason I know it to have been before October 10th was that Mr. Russell asked me if I thought she was mentally capable of signing papers after that paralytic stroke, and I said, no, it would not be fair or just to ask her to sign any papers, and that is why I know the signing of this paper was done before she had that stroke." It was after Mr. Loomis had been to the house that Russell had asked her opinion as to Mrs. Russell's mental capacity.

Mrs. Cormier says, that she arrived on the 25th of June 1922, in Fargo, and she left on the 19th day of July. She says she saw her sister every day and would remain from 10 to 15 minutes,—that she was not able to have a conversation with her sister at any time.

Mrs. Louise Erickson, a half sister of Mrs. Russell, testified she came to Fargo on the 9th day of July, 1922, that she remained three weeks; called on Mrs. Russell nearly every day; Mrs. Russell did not recognize her at any time; couldn't hold any conversation with her; in her opinion Mrs. Russell did not have the mental capacity to transact business of any importance.

On cross-examination she testified that she had not corresponded with

her sister Mrs. Russell, and Mrs. Russell had never written to her. During her visit in 1922, Mrs. Russell didn't talk to her. "She would be talking to Russell. She wouldn't talk to me, he would talk to her but she never talked to me. He would talk to her; she couldn't talk to him."

Henry Ramsden testified his wife was a niece of Mrs. Russell. He visited Mrs. Russell about the 25th of June, 1922. The last time he saw her in 1922, was the latter part of October. He visited her some twenty or twenty-five times. He would stay no more than fifteen or twenty minutes at a time, never saw her out of bed. She was not bright, she was very feeble. She didn't recognize him at any time during these visits. He did the talking. She didn't carry on a connected conversation; frequently made statements that were not responsive to questions asked her. In his opinion she was not capable of transacting business of importance. He ceased calling on her because at one time he went in beside the bed and started to talk to her about the property he was living in. She started to talk about some other property she owned; he only stayed a few minutes. He went out into the front room and Russell said, "If you ever come around here and try to get any of her property, I will kill you." He (witness) replied "You don't mean that Russell," and said, "Mrs. Russell is in no condition to give me any property. You know it." He says, "I don't want you to come around her any more at all. If you do, I will hit you in the eye." I said " 'You dassent,' and he hauled off and hit me in the eye. I had trouble with Russell when I was putting in a heating plant." Q. "Was it your house or theirs?" A. "It was their house. I had leased it." Q. "Do you remember your wanting to buy some western property and wanted to get Mrs. Russell to go in with you and finance it?" A. "I believe there is something of that—yes, sir, I have a faint recollection of writing to her about something like that, I never got any reply. I did expect to get some of her property at that time, not for myself, but for my children."

"It was always understood, she always said before, in 1905, she said she expected—yes, I lived in a house belonging to Mrs. Russell. I did not pay rent, no, sir. She told me when I came back what the price would be, $15 a month, 'You can pay it now and it will be all right with me, any time you have it, if you don't pay it, I have differences

with Mr. Russell.  So far as I am concerned you can stay in the property as long as you wish.'  No, I haven't got around to pay it yet.  Yes, I have been helping the plaintiff to find witnesses and have put in some time in that way.  My wife and myself had told Mrs. Russell we thought it was very foolish of her to marry Russell at that time.  I went there to see Mrs. Russell because I thought a great deal of her and I wanted to see her."

Mr. Russell says, "Mrs. Cormier usually brought her little girl and occasionally the two children when she came to see Mrs. Russell in June, 1922.  On one occasion Mrs. Cormier was sitting on the side of the bed, and the little girl in a chair was holding my wife's hand, I was out in the other room.  Mrs. Cormier was leaning over the bed talking to my wife, I came up close and heard the conversation, Mrs. Cormier said to my wife, 'do something for the little children, you must do something for my children,' she said, 'don't forget the little children,' and then I made myself known."  He further says, "Ramsden did solicit his wife for money, and did exhibit to Mrs. Russell a plat of land he owned or wanted to sell, and Ramsden prepared the plat himself."  This plat was introduced in evidence by the defense.  Mr. Ramsden denies the conversation.  The plat is written in lead pencil, and there was no attempt made to prove that it was not in Mr. Ramsden's handwriting.  Russell said it was because of this attempted deal he quarreled with Ramsden and hit him in the eye.

Witness Keller talked with her when he came to the house to do some plumbing in 1922.  At that time he told Mrs. Russell about his baby just born, and a year later when he came to do some plumbing she asked him about the baby, that he told her about the year before, which shows that she had a good memory for current matters.  She asked Mr. Keller if Mr. Russell was paying the bills, and on being told that he was, she seemed to be pleased with the fact that Mr. Russell took care of his accounts.

Mrs. Emma J. Walker who is in the insurance business, stopped several times to talk insurance to Mrs. Russell and she said she was not looking after that business any more, that he was looking after it all. "If I wanted any insurance I would have to take it up with him." "She said, I would have to see Mr. Russell for any insurance, that he was looking after all the insurance, that she wasn't in very good health, and

sometime later the property would all be his, and it would be better for him to do the work. That is exactly what Mrs. Russell said."

Mr. Russell brought Mr. D. D. Sullivan to the house to test her eyes for glasses, during the summer or fall of 1922. Mr. Sullivan says, "It was on September 10th, 1922, my records show. She was propped up in bed, so we moved her out in the other room in to a big easy chair. She said, 'Mr. Russell has been very good and kind to me, I don't know what I would have done without him.' She knew me and shook hands with me. She was rational and the pupils of her eyes were normal." "Mrs. Russell said she could read German better, and Mr. Russell got her a German book, and she read a paragraph. I did not understand what she was reading but she seemed very well pleased and said, 'that was good enough.'"

The defendant testified that Mrs. Russell became ill in April or the first of May, 1920; that during the fourteen years before her illness she was able to attend to her business at all times; that her memory was good; that she was pretty strong-minded and when she made up her mind to do anything she did it. He always assisted her in her business deals, she very seldom, if at any time, making a business deal without consulting him; they had arguments over property matters—fierce arguments; they talked pretty harsh about business, but he would not call that a family quarrel; they had strong differences of opinion on property matters; had business quarrels.

On the 16th or 17th of June, 1922, she had a sinking spell and he thought she was going to pass away. He requested his daughter, Mrs. Farrar, to write to some of her relatives and she wrote to Mrs. Cormier. On or about the 17th of June he met Doctor Burton in the Savings & Loan Bank and the doctor told him that his wife wanted to make a will. The two went over and talked to Mr. Loomis and they decided that he, the defendant, should get Mr. Shure to go up and make a will. Later deceased continued to improve. She did not have the "collapse or stroke" that Mrs. McKinnon testified to as occurring on or about the 10th of October. He denied that he had made any statement to Mrs. McKinnon with reference to wondering whether his wife would ever be clear in her mind again. After the 16th or 17th of June, he frequently talked with his wife and assisted her; took the place of a nurse when the nurse was out and did house work; assisted her to get

into the invalid chair. She got up nearly every day. He talked to her occasionally about property matters. Her mind continued to be clear and her speech improved after the middle of June. They talked about nearly all of the properties. Prior to 1920 he had never seen any sores or eruptions on Mrs. Russell's face or body. He did not ask Mrs. McKinnon to go out on the day the deed was executed, but he asked her to stay. She was present when the deed was executed. That morning he told Mrs. McKinnon he would like to have her stay in the afternoon, because he was going to have some business transactions and he wanted her to be there. After Mrs. Russell returned from the hospital in June, 1922, she read newspapers somewhat. He talked to Mrs. Russell on the day the deed was signed. She seemed in normal condition; her voice clear; she talked so that he could understand her. Mr. Wood came about 2 o'clock in the afternoon. A Miss Higgins came with him. Mrs. McKinnon was there; "I know she was." Mr. Wood took the deed and went in where his (defendant's) wife was. He said he came up to attend to the deed, to execute it, and Mrs. Russell said all right. The witness and nurse propped her up in bed. He was going to let her sign the paper alone; she couldn't get her hand on the paper quite; he took hold of her hand, and wrote it, "she wrote it and I held her hand." Mr. Wood read the deed; read the descriptions of each piece of property. At Mr. Wood's suggestion, a mark was placed on the deed between the parts of her name. In the forenoon he had requested Mr. Tietgen and Mr. Graham to come to the house for the purpose of witnessing the deed. The witnesses were there when the deed was executed. They signed immediately after Mrs. Russell executed it in manner described. After being signed by the witnesses, it was handed to Mr. Wood who gave it to Miss Higgins. She took the acknowledgment and handed it back to Mr. Wood. He gave it to Mrs. Russell. The deed was not given to Mrs. Russell after it was executed, it was given to the defendant. He put it in his pocket; kept it in the washstand in the bedroom; had other papers in there. He recorded it in October, 1923.

This being a trial de novo we have examined the evidence very carefully for the purpose of determining the question of the competency of Mrs. Russell to execute the deed which the plaintiff seeks to have set aside, and we have quoted the gist of the testimony of the important

witnesses upon which we base our conclusion that the plaintiffs have failed to sustain their contention that Mrs. Russell was incompetent to execute the deed. The evidence shows that on or about the 20th of June, 1922, Mrs. Russell had a "sinking spell" but she rallied and continued to improve up until the 31st of July, when nurse Merganthal left, and Mrs. McKinnon took her place. Mrs. McKinnon is the only witness that testified that her condition from the time that she came continued to grow worse, that she had a stroke on the 10th of October and that she was not competent to execute a deed on the 20th of November, 1922.

Mrs. McKinnon testified, that Mrs. Russell had a paralytic stroke about the 1st of October, again she placed it about the 18th of October, and finally it was on the 10th of October. She fixes the date October 10th as the date upon which she bought some nightgowns. She knows it was that date because she subsequently went to the store where she bought the gowns for the purpose of ascertaining the date. The date upon which Mrs. Russell had a third stroke, or whether she had a third stroke at all, depends upon Mrs. McKinnon's testimony. She states that Banker Loomis came there to have Mrs. Russell sign a withdrawal and she swears positively that that was before the 10th of October. She is cross-examined at length and given an opportunity to correct her testimony. She is asked, "If there is other evidence in the case showing that it was on the 23rd day of October that the withdrawal receipt was signed, if she would still claim it was before the 10th of October, and she insists positively that it was before the 10th. The withdrawal receipt was for $10,700, it was produced and received in evidence as exhibit "G," it is dated October 23, 1922, and also has stamped upon its face the date October 23, 1922. Mrs. McKinnon admits that she was hostile to the defendant. Mrs. Russell had told her that she would be remembered in the will. The defendant told her that she would be remembered in Mrs. Russell's will, and there was no will, and Mr. Russell discharged her. She says, that when they told her that she was to be remembered in the will that she did not pay any attention to what they said, but her evidence, her hostility, and her employment of an attorney when she was discharged show that she was disappointed and her testimony is not sufficient to prove that Mrs. Russell continued to grow worse after she came to nurse her, that she had a stroke on the 10th of

October and was not competent to execute the deed on the 20th of November. This testimony is contradicted by Mr. Russell, by the letter written by Ramsden to Mrs. Cormier, the letter from Helen Ramsden to Mrs. Cormier's daughter, the letter of Mrs. Cormier to Mrs. Russell; the testimony of disinterested neighbors who stopped and talked with Mrs. Russell when she sat in her wheel chair on the porch, the withdrawal receipt which Mrs. Russell signed on the 23d of October, by all of the witnesses who were present when the deed was executed, and by the execution of withdrawals and deeds in 1923.

On the morning of May 31, 1922, Mrs. Russell wanted to go to the bank and wanted Mr. Russell to go with her. He was doing some repair work about the house and told her he would go just as soon as he got through. She, however, did not wait for him, she went down to the bank and after being there some time had a stroke of paralysis. But even then she could talk, her first exclamation was "Oh, I cannot walk," and when her husband appeared on the scene she called him the vilest kind of names. She blamed him for not coming with her to the bank, and thought that if he had come, she would not have had the stroke. That was their last quarrel. From that time until the day of her death, the defendant's conduct towards his wife was of uniform kindness. He waited upon her, he acted as nurse, he cooked for her, he fed her, he helped to put her in her invalid's chair, he bought her ice cream and pop, and things that she liked to eat. In 1923, he offered nurse Bliss $1,000 if she could get Mrs. Russell up and walking. After the 14th of April, 1923, they had two nurses, one for night and one for the day. Dr. Burton visited her some 350 times from the 31st of May 1922 to the 10th of October 1923, and there was not a cross word so far as the record shows between the defendant and Mrs. Russell. From all the testimony in the case, the relations between the defendant and Mrs. Russell after May 31st, 1922, were pleasant and without friction. It would be strange indeed if Russell's devotion and attentiveness to his wife did not find a responsive chord in her affections.

The case of McAyeal v. Hillison, an Illinois case, reported in 291 Ill. 319, 126 N. E. 209, is a case very much in point. In that case Thom Hillison and his brother John by working together had acquired a farm of 160 acres of land, but it was in Thom's name. In October, 1917, Thom being very sick, the doctor took him to a hospital in

Bloomington, for care and treatment. The court said: "An examination disclosed he had a degenerative disease of the blood vessels, known as arteriosclerosis, and as a result of that, interstitial nephritis and a condition of the heart known as myocarditis, heart degeneration. He was uraemic and dropsical, the skin of his legs was sore, and he developed gangrene of the legs and feet to some extent. His uraemic condition inclined him to be stupid and at times it was difficult to get him to comprehend. On October 15, 1917, W. A. Cameron, Dwight Day and Julia Halverson visited Thom at the hospital, and while they were there the deed to John Hillison for the west half of the quarter section constituting the Hillison farm was executed. It was witnessed by Julia Halverson and Day, and was acknowledged by Cameron, a notary public."

Dr. Chapin the physician in the hospital, nurses Carson, Strohmeier and Lulu Justis all testified, that the patient was incompetent to transact any business of importance on the day of the execution of the deed.

Dr. Donovan who brought Hillison to the hospital, W. A. Cameron, Dwight Day, A. P. Hanson, and Knutson and others, testify that in their judgment he was competent to make the deed, and the court held, that the plaintiff had failed to show that Hillison was incompetent and the judgment of the lower court was reversed. We quote from the opinion as follows: "Impairment of the faculties by disease or old age will not invalidate a deed if the party executing it had sufficient mental capacity to understand his act. It must be shown that the grantor did not have sufficient mind and memory to comprehend the nature and character of the transaction. Mental weakness that does not amount to inability to comprehend and understand the nature and effect of the transaction is not sufficient to invalidate a deed. The burden was on appellees to prove the allegations of their bill. Willemin v. Dunn, 93 Ill. 511; Kimball v. Cuddy, 117 Ill. 213, 7 N. E. 589; Sears v. Vaughan, 230 Ill. 572, 82 N. E. 881; Dalbey v. Hayes, 267 Ill. 521, 108 N. E. 657."

The judgment of the lower court holding that Hillison was not competent to execute the deed was reversed and set aside.

The 13th finding of fact that there was no delivery of the deed to the defendant by Mrs. Russell is assigned as error. Section 5495, Comp. Laws 1913 provides: "A grant takes effect so as to vest the

interest intended to be transferred only upon its delivery by the grantor."

Section 5496 provides: "A grant duly executed is presumed to have been delivered at its date." Section 5497 provides: "A grant cannot be delivered to the grantee conditionally. Delivery to him or to his agent as such is necessarily absolute; and the instrument takes effect thereupon, discharged of any condition on which the delivery was made."

The trial court states in the memorandum opinion: "I do not know whether my memory serves me right, but as I remember there is no evidence in the case showing where this woman gave a verbal expression of delivery (of the deed)." On page 825, Mr. Graham who is a witness on the deed, and a witness at the trial stated, "Mr. Wood then asked Mrs. Russell, if he should turn that (the deed) over to Mr. Russell, and she said, 'Yes,' and he handed the deed to Mr. Russell." On page 949, of the record, Miss Higgins who took the acknowledgment testified, that, "Mr. Wood stepped to the bed and asked her if she wished him to deliver this deed to Mr. Russell to retain, she said, 'Yes,'" Mr. Wood who drew the deed, states on page 856 of the record, "I then turned to Mrs. Russell and asked her if she wished me to deliver the deed to Mr. Russell, and she said, she did, and I delivered it to Mr. Russell." The trial court further states, that Mr. Russell testified that he was to have the property after her death, that Mrs. Walker's testimony only corroborates Mr. Russell, that he was to have the property after her death, that Mr. Russell was to have her property, that is in substance her testimony, I may not be exactly right. In conclusion the trial court said, "That Mrs. Russell was at least of such feeble mentality that she was not of sufficiently sound mind to appreciate the transaction, and 2nd, that because of that fact, there was not a delivery of this deed, there was no intention of delivery of the same, and if one might say that she appreciated what she was doing I would then be of the opinion that in any event the transaction was not to take effect until after her death."

The trial court's opinion and decision was rendered immediately after the argument of counsel, and of course, it was impossible for any man to remember the details of the testimony in such a voluminous record of over one thousand pages, and if important evidence was overlooked or forgotten it is not to be wondered at. In his opinion there

are many expressions of uncertainty, not only in regard to the evidence, and what it proves, but also, as to the nature of the transaction. First, he says there is no evidence of a verbal delivery of the deed. Second, Mrs. Russell was not competent to make a deed, and, therefore, there was no delivery. Third, that if Mrs. Russell was competent that the transaction was not to take effect until after her death. He finds as a fact, that the procuring of the deed was an attempted testamentary disposition of the property which was void under the statutes relating to wills.

Three witnesses testified positively that there was a verbal delivery, that Mrs. Russell when asked if the deed was to be delivered to Mr. Russell, said "Yes." It further appears from their testimony that the descriptions of the property conveyed were read to Mrs. Russell separately, and after the reading of each description, she seemed to recognize the property, and called it by some name, as for instance, when the lot number of the hotel was read to her, she recognized it, and said "That is the Palace," meaning the Palace Hotel, and after the reading of each description she was asked if she understood the property she was conveying to her husband, and she replied that she did. After reading the last description Mr. Wood, said, "You are by this deed conveying the majority of your property to your husband, is that what you want to do? She answered, "Yes, papa (meaning her husband) and I have talked it all over and we have a complete understanding, and that is what I want to do." If this testimony is true, Mrs. Russell was competent, and knew she was executing a deed and not a will, that she delivered the same to the grantee and that under the statute it could not be shown to have been delivered conditionally, so as to require further execution or attestation as a will. It was a deed in præsenti.

She recognized the different properties by the numbers of the lots, and calling some of them by their names, and she clinched it by saying that she and her husband had a complete understanding, and that she wanted to deed that property to her husband. In the light of this testimony, how can it be said that the procuring of the deed was an attempt to dispose of the property by will? The testimony the trial court refers to, viz., that he was to have her property after the death of Mrs. Russell, and the testimony of Mrs. Walker which he said corroborates the testimony of Mr. Russell, is consistent with the execution

of the deed. Neither witness states how the property was to go to Mr. Russell and the facts are, the deed was executed and delivered to Mr. Russell without any condition whatever, and if Mrs. Russell was competent to execute the deed it is absolute. State Bank v. Newell, ante, 184, 212 N. W. 848.

This is a trial de novo, and while the decision of the trial court is entitled to appreciable weight, it is the duty of this court to carefully review and analyze the evidence, and to render a just decision thereon. There is no direct evidence that Mrs. Russell was not mentally competent to execute the deed, at the time of its execution, except, the testimony of nurse McKinnon. No other witness testified, that she was mentally incompetent, on that date, and the testimony of Shure, Ramsden, Cormier, Erickson, McGuigan and Merganthal relates to several months prior to the time of the execution of the deed, and the testimony of nurse Bliss about six months after its execution. On the other hand the testimony of the neighbors who talked with Mrs. Russell when she sat in her wheel chair on the porch in the fall of 1922, the testimony of the witnesses who were present when the deed was executed, and the statements made by Mrs. Russell at the time; the withdrawals of large sums of money which she signed, the withdrawals she signed in 1923, and the deeds she executed in 1923, that have never been questioned, the evidence which shows that they quarreled about property, but there was never any talk of a separation, and that they lived together continuously, that Mrs. McKinnon testified, at the time Mr. Russell was kidnapped, they immediately took Mrs. Russell to the hospital, and immediately brought her home when Mr. Russell returned; that when Mr. Russell owned a little grocery store, Mrs. Russell helped in conducting it, by selling goods, and waiting on customers, and in running the store when he was absent painting, papering and repairing the property, that they worked together, Mrs. Russell helping Mr. Russell in the store, just as she helped her first husband tending bar in the saloon; that their affectionate relations after the 31st of May, 1922, are entirely consistent with the statement of Russell, that he and his wife had agreed on the transfer of this property and the statement of Mrs. Russell at the time the deed was executed that she and "papa" had a complete understanding, and that she wanted to deed the property to him, all considered together, seem almost con-

clusive proof that she knew what she was doing and was competent to do it.

The plaintiff has entirely failed to prove that Mrs. Russell was not competent to execute the deed in question, and the judgment must be, and is reversed. Judgment is ordered for the defendant.

BIRDZELL, Ch. J., and BURR, and NUESSLE, JJ., concur.

CHRISTIANSON, J. (dissenting). The great question in this case is: Did Clara B. Schmidt-Russell, at the time of the execution of the deed, have sufficient mental capacity to understand in a reasonable manner the nature and effect of that act? More than thirty witnesses testified upon this question in the trial court, and the transcript of their testimony covers more than one thousand pages of the typewritten statement of case. The trial court, after hearing the testimony and observing the witnesses who gave it, held that Clara B. Schmidt-Russell did not have sufficient mental capacity at the time of the alleged execution of the deed to understand the nature and effect of her act, and that, consequently, the deed was void. The record contains not only the formal findings of fact, but a memorandum opinion rendered by the trial judge at the conclusion of the trial wherein he clearly and definitely expressed his views on the credibility of the witnesses and the weight of their testimony. After a careful perusal of all the evidence, and giving due weight to the determination of the trial court (Christianson v. Farmers' Warehouse Asso. 5 N. D. 438, 444, 32 L.R.A. 730, 67 N. W. 300), I am of the opinion that the judgment rendered by the trial court is in accord with the evidence, and should be affirmed. Hence, I cannot agree with the majority opinion and respectfully dissent therefrom.